[No. 12669. Department One. August 5, 1915.]

EVA P. DRUSE *et al.*, *Appellants*, v. PACIFIC POWER & LIGHT COMPANY, *Respondent.*[1]

APPEAL—REVIEW—HARMLESS ERROR. Error in giving or refusing instructions is harmless, where recovery cannot be had in any event.

ELECTRICITY—PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE — EVIDENCE—SUFFICIENCY. A farmer, moving a hay derrick underneath high power electric wires, was guilty of contributory negligence, precluding any recovery for his death, where he drove the derrick against telephone wires with such force as to draw the poles together and cause high power lines above to sag and come in contact with the derrick, it being evident that the clear way might not be sufficient, and from past experience he was aware of the danger of contact, and where, after the contact was established and obvious, instead of having the current cut off, he approached, over the protest and warning of others, to within a foot of a charged cable, and within two or three feet of a log chain which was spitting fire, and received a shock of electricity through a hemp rope which he had attached to the charged derrick in an attempt to lower it.

Appeal from a judgment of the superior court for Yakima county, Preble, J., entered March 14, 1914, upon the verdict of a jury rendered in favor of the defendant, in an action for wrongful death. Affirmed.

*Williamson & Luhman*, for appellants.

*Englehart & Rigg* and *John A. Laing*, for respondent.

CHADWICK, J.—In attempting to move a hay derrick under a high power transmission line belonging to the respondent, John L. Druse came in contact with the electric current and was instantly killed. This action is by his widow and children. From an adverse verdict of a jury, plaintiffs have appealed.

The power line consists of three high tension wires, one set on the top of the pole, and one on each end of a cross-arm set a slight distance below. Under the cross-arm, a telephone line consisting of several wires had been strung.

[1]Reported in 150 Pac. 1182.

When negotiating for a right of way, Mr. Druse and the agent of the company negotiated with reference to the height of the line and his derrick. He presumably knew the danger of a contact with the line and the necessity of obviating it. Prior to 1911, the derrick had come up to the telephone wires, "and Mr. Druse climbed up and lifted the telephone wires over the top." In the summer of 1911, the derrick came in contact with the power line and broke it in two. The shock knocked the horses down on their knees. The wires "burned right in two." Mr. Druse was present in the field. He was helping move the derrick but had "stopped back to shut the gate." Thereafter respondent raised the wires between two poles at the request of Mr. Druse, so that the high power wires were 44 feet 3 inches from the ground on one, and 44 feet 7½ inches on the other. The telephone wires were raised to a height of 40 feet 5½ inches and 40 feet 3 inches. The mast of the derrick was 38 feet 6 inches high.

It is not contended that there was any danger from the electric current in the telephone wires. There was a sag of four or five feet in the power wires and also some sag in the telephone wires. The derrick was rigged on a mast set upon runners made of large timbers. The outfit was dragged from place to place by two teams of horses.

In July, 1912, Druse, with others who were in his employ, was moving the derrick under the power line. The top of the mast came in contact with the telephone wires. The force of the contact was such that the two poles were pulled together, allowing the power wires to sag far enough to come in contact with the derrick. The derrick was rigged with two wire cables called the supporting cable and the pull cable. The one supported the arm of the derrick; the other was used to pull the hay onto the stack. We shall adopt appellants' narrative:

"One end of the supporting cable was attached to the end of the arm of the derrick, ran through the pulley on the top of the mast, and thence ran to the cross-beam to which it was

attached by a rope at a point to the left of the mast, the rope running around the beam and over an iron hook attached to the end of the cable. This cable did not reach the ground and showed no signs of electricity due to contact with the power line, the distance from the iron hook to the ground being too great for the electricity to flash over. The pull cable ran down from the head of the mast through a pulley attached to the cross-beam supporting the mast at a point to the right of the mast, and was then dragging along the ground about 40 or 50 feet back from the derrick. The distance between the points where the pull cable was attached to the beam and the point where the supporting cable was attached was 3½ feet. After coming in contact with the power line, the pull cable showed signs of electricity where it struck the ground. The pulley through which this pull cable ran was attached to the cross-beam by an iron chain, the ends of the chain hanging down to the ground. This chain also showed signs of electricity where it was in contact with the ground. Except as stated, no other parts of the derrick showed signs of electricity except at the point of contact of the mast with the high tension wire. The progress of the derrick was stopped by the wires, and thereupon Druse, after observing the situation of the derrick, attempted to lower the arm of the derrick by unloosening the supporting cable where the same was attached to the cross-beam by a hemp rope. This cable was tied with a slip knot, so that it could be easily loosened, the end of the rope being first looped over the iron hook and then allowed to drag on the ground. Druse took hold of the rope about a foot from the cross-beam and then removed this loop from the iron hook. He then attempted to jerk the rope loose, but before making the pull necessary to loosen same, received a shock of electricity through the rope which resulted in his death; a period of 4 or 5 minutes having elapsed between the time the derrick struck the wires, and the time when he was killed. At no time prior to his death was Druse closer to the cable and chain showing indications of electricity than 2 or 3 feet, and the undisputed testimony shows that the electric shock received by Druse came through the hemp rope held by him and the apparently dead supporting cable."

We think the record will bear the stronger statement that there was a "rumbling" "crackling" "loud noise" and "blue

flames" and a "spitting" of electricity which was "apparently continuous;" that sparks were flying from the metallic parts of the derrick, except the fall of the supporting cable—it showed a contact at the block at the top of the mast—and that the grass was burning where it came in contact with the pull cable, which was dragging 40 or 50 feet back on the ground. It was evidently Druse's idea that if the supporting cable, which was tied to the mast by a hemp rope, was released and the arm pulled away from the wire, that the derrick would be freed of the contact. He accordingly directed one of his men to go into the framework of the derrick and untie the rope and let the arm down so they could proceed. This the man refused to do, saying "Not on your life. I wouldn't go in there for ten thousand dollars." The log chain was spitting fire and there was some smoke but no fire in the derrick.

A witness testifies to his recollection that one of the men said to Mr. Druse when he was about to take hold of the rope, "keep away from there." Another witness, who qualified as an expert electrical engineer, expresses the opinion that both cables were equally alive, but that no sparks came from the fall of the supporting cable because the end of it was too far from the ground.

Appellants allege negligence on the part of the power company in the construction of its line at such a height as would not allow the free passage of the hay derrick, and the fact that the wires over Druse's premises were not protected by guard wires or otherwise, and in the fact that the automatic oil switches were not adjusted and operated properly so as to cut off the current at the time of contact. Respondent pleads the general issue and contributory negligence. A motion for nonsuit was overruled, as was also a motion for a directed verdict.

Before argument, counsel for appellants withdrew the charges that respondent had no safety devices and that the wires were not properly insulated. The only charge remain-

ing is that respondent had not erected its pole line and placed its wires high enough to permit a free passage of the hay derrick. This charge and the plea of acquittance are the only questions before us. The assignments of error all go to the instructions of the court, but we think they are immaterial in the light of the evidence. We have held that we will not re- verse a case for error in giving or refusing to give instructions where a recovery cannot be had in any event. *Nilsson v. Martinson,* 72 Wash. 286, 130 Pac. 106.

Admitting that respondent's wires were not high enough to permit a free passage of the derrick, we think Mr. Druse was clearly guilty of contributory negligence and that such negligence was the proximate cause of his death. The day was a clear day. There was nothing to obscure his sight. The derrick was moved slowly across the field. It must have been apparent to a casual observer that the clear way might be insufficient, in plenty of time to stop the derrick so as to avoid the contact. He might have done as he did the year before under a like condition, climbed the mast and passed the telephone wires over its top. Mr. Druse was a man of more than ordinary intelligence, and from all the prior circumstances must have known the danger of a contact with an electric current. Instead of going carefully about his work, he drove into the telephone wires with such force as to draw the tops of the two poles, set three feet in the ground, toward each other, permitting the inevitable consequence, the dropping or sagging of the power line to a point of danger. We had omitted to say that on each pole across Mr. Druse's farm there was a tin sign warning against the danger of tampering with the wires.

But up to this point decedent was in no danger. Indeed, he was charged with a higher duty to protect himself. It was then immaterial how the condition arose. It was enough that it existed. It was open, obviously dangerous and known to be deadly. Instead of keeping away from it until the company could be telephoned to cut off the current, as

was done immediately after the accident, Mr. Druse, over the protest and warning of at least two of his men, deliberately set about to correct the situation, placing his hands within a few inches, or at most within a foot, of the hook on the end of the supporting cable, and within two or three feet of the log chain, which was spitting fire.

Counsel make much of the fact that the witness who refused to untie the rope that held the supporting cable, saying "Not on your life" and "I would not go in there for ten thousand dollars," followed Mr. Druse and was within a foot or two of him and was prepared to assist him at the time he took hold of the end of the loop.

We attach no importance to this circumstance. In the psychology of human nature there is nothing more prominent, or more to be wondered at, than the fact that a man will do something in company with another that he would never do by himself. This is especially true when there is a seeming imputation of cowardice, and it matters not whether the charge is made by spoken words or is insinuated by the conduct of another. The question here to be decided is whether Mr. Druse acted the part of prudence, and his act is not to be measured by the act of a third party who assumes to measure lances with him on the field of personal or physical courage.

Can there be any difference in the minds of reasonable men as to the negligence of the deceased and the proximate and contributing cause of his death? In other words, with a danger open and obvious, can any one say that he acted as a prudent man should have acted under like circumstances?

We find that deceased was guilty of contributory negligence as a matter of law; that the instructions complained of were not prejudicial for the reason that the jury would probably have returned the same verdict whatever the form of the instructions, or, if it had returned a verdict for the appellants, it would have been the legal duty of the trial court to arrest the judgment.

Whether the instructions given are technically correct, and whether the instructions refused should have been given, become, therefore, questions purely academic. The merit of the case is apparent, and the errors assigned are technical and will be disregarded under Rem. & Bal. Code, § 307:

"The court shall, in every stage of an action, disregard any error or defect in pleadings or proceedings which shall not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect."

Affirmed.

MORRIS, C. J., MOUNT, ELLIS, and HOLCOMB, JJ., concur.