GRACE MURPHY, Administratrix, Appellant, v. IOWA ELECTRIC COMPANY et al., Appellees.

JUNE 26, 1928.

REHEARING DENIED SEPTEMBER 28, 1928.

568

Parrish, Cohen, Guthrie, Watters & Halloran and Carl P. Knox, for appellant.

C. Woodbridge and Harry Wifvat, for Iowa Electric Company, appellee.

Batschelet & Vincent, for Panora-Guthrie-Center Farm Mutual Telephone Co., East End, and Panora-Guthrie-Center Farm Mutual Telephone Co., West End, appellees.

KINDIG, J.—Only one question is presented for determination, and that is whether or not this cause should have been submitted to the jury. In order to arrive at a solution for the problem, a careful consideration of the facts is first necessary.

Historically they are the following: James R. Shipley, in the year 1922, secured a contract with the Iowa state highway commission and the board of supervisors of Guthrie County to grade a part of the main road between Guthrie Center and Panora. This thoroughfare is known as the Panora Speedway. That contractor retained the west portion of this work for himself, but relet the east section thereof to Bennethum, another contractor. It was on the latter division that James Murphy, the decedent, through an electric shock, met his death, between 9 and 10 o'clock in the forenoon of October 13, 1923.

Murphy was a laborer, approximately 36 years of age. He possessed a vigorous mind and robust constitution. His duties at the time consisted of hauling dirt for the undertaking, by the use of three horses hitched to a dump wagon. Prior to the fatal accident, this man had been employed by Shipley for duty on the west end. However, that task was completed, and, Shipley loaned some of his men, including Murphy, to Bennethum, for service on the east segment of the improvement, where the casualty occurred.

Many years before October 13, 1923, the appellee Iowa Electric Company had obtained a franchise to, and in accordance therewith did, install and maintain an electric transmission line across Guthrie County along the "Panora Speedway." Such "high line" was constructed by setting poles 30 feet long, at a distance of 150 feet apart. Each pole was placed 5½ feet in the ground. Attached to the top of the individual pole was a wishbone cross-arm, composed of galvanized iron, with one electric

wire fastened to each of its three points. Connection of the wire to the "points" was made by insulators of 45,000 volts resistance, while the electric line, on October 13, 1923, actually carried a current of 33,000 volts. Furthermore, there was, as a part of this electric line, a static wire, carrying no current of electricity, which was secured to the top of the poles by means of wooden upright pieces. During all the time Murphy and the other men were engaged in their employment in the building of this grade, there were, as is required by law, signs attached to the poles, informing the public of the electric voltage carried.

The appellees telephone companies, or one of them, before the grading work was begun, had erected along the same highway a system of poles about half the size and half the height of those used by the appellee Iowa Electric Company. Appellant's intestate, at the time he was killed, was driving his team and wagon from the east and west "Panora Speedway" northward under the "electric high line" onto farm premises, for the purpose of furnishing the landowner ingress and egress consistent with the new grade. Either with or without an express agreement so to do, the telephone companies temporarily placed their wires at intervals on some of the "electric high-line poles." For some reason (perhaps because of the grading operations), the telephone wires became loose or slack, and shortly before Murphy's death, a representative of the telephone companies drove a nail or spike into the "high-line pole" near the location of the accident, and hung a telephone wire thereon.

A dispute appears between the appellant, on the one hand, and the appellees, on the other, concerning the height of the "high line" at the time and place Murphy was killed. Appellee Iowa Electric Company claims that its wires were at least 10 feet higher than the top of the newly graded main roadbed (the nearest outer edge of which roadbed was 12 feet from the high-line poles), and that they were 16 or 17 feet above the approach upon which Murphy was working; while appellant contends that the lowest electric wire of the Iowa Electric Company, appellee, was not more than 10 or 12 feet above the surface of the fill, and that the "spike" holding the telephone wire was from 14 inches to 2 feet beneath the lowest high-tension wire.

On the morning of October 13th aforesaid, Murphy, while engaged in driving his team, encountered the telephone wire,

which had become loosened from the "spike" on the pole, previously described, and was swinging about four feet from the ground. So one Frenchy, a foreman of the grading gang, first tried to replace the wire on the hook by throwing it from the grade, but failed, the distance being too great. Therefore he stopped Murphy, who was approaching with his team and loaded wagon, and then the foreman raised the telephone wire, in order that the team thus driven could pass thereunder, with suggestions that the wagon should be halted immediately beneath. These directions were obeyed by Murphy. Whereupon the foreman instructed this driver to stand upon the wagon, reach up, and place the telephone wire back over the "spike." Accordingly, Murphy endeavored so to do, but found the height too great to be thus reached. Being unable to accomplish the required disposal of the wire in that manner and way, Murphy then devised a scheme of his own, and in carrying it out, he stepped from the front part of the wagon over the seat onto the dirt in the back, then took the telephone wire in his hands, and gave it a swing, in order to loop it over the "spike" on the pole to the west of him. When thus in motion, the telephone wire went up rainbow shape, and came in contact with the "highline" wire, causing Murphy's electrocution.

Consequently, appellant predicates her action for this death upon appellee's negligence. She alleges that the wires should have been more completely insulated and guarded, and that the entire "high line" should have been raised in conformity with the grade; and she further asserts that the telephone wires should in no event have been placed on the "high-line" poles. Material to these charges are the further assertion and evidence in support thereof to the effect that inspectors of the "high line" were over the premises, saw the conditions, and thereby imparted notice to their company.

As a defense, appellees plead: First, their own freedom from negligence; second, contributory negligence of plaintiff's intestate; and third, the original negligence of the plaintiff's intestate, which became the proximate cause of the unfortunate death.

Those were the material issues submitted to the trial court at the time it directed a verdict against the appellant and in

favor of the appellees. Should there be a reversal? We think not.

I. Because of Section 8323 in the 1924 Code, a presumption of the Iowa Electric Company's negligence existed in appellant's favor; yet, so far as the other appellees are concerned, the burden of proving passive, as well as active, negligence still remained upon her. Nevertheless she argues that, under the record presented in the case at bar, there is present sufficient evidence requiring that the entire cause affecting all the appellees be submitted to the jury for its finding and determination.

Reliance by appellant is made upon the following authorities: *Bach v. Iowa Cent. R. Co.*, 112 Iowa 241; *Sikes v. Sheldon*, 58 Iowa 744; *Marquette v. Chicago & N. W. R. Co.*, 33 Iowa 562; *Whitsett v. Chicago, R. I. & P. R. Co.*, 67 Iowa 150; *Tobey v. Burlington, C. R. & N. R. Co.*, 94 Iowa 256; *Barnhart v. Chicago, M. & St. P. R. Co.*, 97 Iowa 654; *Swegle v. Chicago, B. & Q. R. Co.*, 196 Iowa 413; *Carlson v. Meusberger*, 200 Iowa 65; *Walters v. Iowa Elec. Co.*, 203 Iowa 471; *Fidelity & Cas. Co. v. Cedar Valley Elec. Co.*, 187 Iowa 1014; *Cawley v. Peoples Gas & Elec. Co.*, 193 Iowa 536; *Toney v. Interstate Power Co.*, 180 Iowa 1362; *Crawford v. Standard Tel. Co.*, 139 Iowa 331; and other cases.

Assumption, for the purposes of this cause, is made by us that appellees' negligence was the proximate cause of Murphy's death, and this we do without expressly deciding the proposition.

II. Remaining, then, before us for solution is the difficult task of concluding whether or not appellant's intestate came to his death because of his own contributory negligence. Before discussing the evidence relating to this phase of the litigation, it is important to review and give due force and effect to the controlling legal principles.

III. The presence or absence of contributory negligence, generally speaking, is peculiarly a question for the jury, rather than the court, to detect and settle. *Lamb v. Wagner Mfg. Co.*, 155 Iowa 400; *Toney v. Interstate Power Co.*, 180 Iowa 1362; *Phelan v. Foutz*, 200 Iowa 267.

IV. Moreover, it is to be remembered that there are some instances where it is the province of the court, and not the jury, to judge whether or not the contributory negligence is such as to bar a recovery.

V. Often it has been stated that each case must rest upon its own facts in this regard. *Barboe v. Sioux City Service Co.,* 205 Iowa 1074, and other similar authorities.

VI. If there is a conflict in the evidence as to what the person accused of contributory negligence did or did not do, the question is then one for the jury.

Likewise, even though it is known what was done by that individual in this regard, yet if his conduct is such that there may fairly be different opinions with respect to it, and one man honestly and reasonably says it was in accord with ordinary prudence, while another, just as sincerely, and with equal reason, contends it was not, then there is a jury question. *Moore v. Chicago, St. P. & K. C. R. Co.,* 102 Iowa 595; *McLeod v. Chicago & N. W. R. Co.,* 104 Iowa 139; *Stoker v. Tri-City R. Co.,* 182 Iowa 1090; *McSpadden v. Axmear,* 191 Iowa 547; *Eaton v. Elman,* 192 Iowa 719; *Waring v. Dubuque Elec. Co.,* 192 Iowa 508; *Devaney v. Omaha & C. B. St. R. Co.,* 184 Iowa 1084; *Wolf v. Reeves,* 195 Iowa 610; *Zellmer v. Hines,* 196 Iowa 428.

VII. Consistent, however, with the above and foregoing doctrine, and in no way in conflict therewith, is the additional theory that, "where the facts are clear and undisputed," and the existence and effect of the plaintiff's contributory negligence sufficiently "apparent to every fair-minded and reasonable man, so but one conclusion may be fairly drawn therefrom," then the trial court may and should direct a verdict in the defendant's favor because thereof. *McSpadden v. Axmear,* supra; *Barboe v. Sioux City Service Co.,* supra; *Leonard v. City of Des Moines,* 190 Iowa 1011; *Roberts v. Hennessey,* 191 Iowa 86; *Waring v. Dubuque Elec. Co.,* 192 Iowa 508; *Towberman v. Des Moines City R. Co.,* 202 Iowa 1299; *Brown v. Rockwell City Canning Co.,* 132 Iowa 631; *Rietveld v. Wabash R. Co.,* 129 Iowa 249. See, also, *Monongahela West Penn Public Service Co. v. McNutt,* 13 Fed. (2d Series) 846; *Barnett v. Des Moines Elec. Co.,* 10 Fed. (2d Series) 111; *Geroski v. Allegheny County L. Co.,* 247 Pa. St. 304 (93 Atl. 338); *Aljoe v. Penn Cent. L. & P. Co.,* 281 Pa. St. 368 (126 Atl. 759); *Hoke v. Edison L. & P. Co.,* 284 Pa. St. 112 (130 Atl. 309); *Druse v. Pacific P. & L. Co.,* 86 Wash. 519 (150 Pac. 1182).

VIII. With these legal principles thus recognized, the

further progress in this discussion is to be made by giving proper significance and due prominence to each.

No dispute exists in the record concerning what was done or not done by Murphy, the decedent, immediately prior to and at the time of his death. Hence, there is nothing to be submitted to the jury, so far as that matter is concerned.

IX. Necessarily, then, there is left only one point that could possibly require the consideration of the jury here, and that is whether or not fair-minded and reasonable men would differ with respect to the imprudence of Murphy's act in throwing the wire as he did, under the circumstances.

X. Appellant seriously insists that there can be and is such difference of opinion among reasonable men in reference thereto as to require a reversal of the trial court's action in directing the verdict. This is true, she says, under the authorities of *Toney v. Interstate Power Co.*, supra; *Graves v. Interstate Power Co.*, 189 Iowa 227; *Travers v. City of Emmetsburg*, 190 Iowa 717; *Cawley v. Peoples Gas & Elec. Co.*, 193 Iowa 536; *Dillon v. Allegheny County L. Co.*, 179 Pa. St. 482 (36 Atl. 164); *Beman v. Iowa Elec. Co.*, 205 Iowa 730.

A careful analysis of those pronouncements will clearly reveal that they do not apply to the facts presented in this record. *Toney v. Interstate Power Co.*, supra, involves a situation where an employee of the telephone company had climbed upon a pole near an electric "high line," to take up the slack in the telephone wire. Attempting to do this, he cut the wire, and, in order to draw it together, used an instrument described as a "come-along," consisting of a block and tackle, with clamps at either end. One wire slipped from the man's hand while his back was turned to the high-tension line, and in the recoil, went over the high electric wire, and then came down to the ground; so that, when this employee reached the ground from the pole where he was working, he found the telephone wire in the grass, and, without knowing that it had come in contact with the highly charged wire, he grabbed hold of it, and was injured. We there said his contributory negligence was a question for the jury, as to whether or not he should have discovered the loop over the other wire even though his back was turned at the time the contact was made.

*Graves v. Interstate Power Co.* embraces these facts: "The

said transmission line was constructed in front of the residence of George Gramlich," where there were cottonwood trees.

"Defendant's poles, which are 110 feet apart, are set so that at least one wire extends a few inches over the fence and across the Gramlich premises. * * * The wires were not covered with any insulating substance whatever, and carried a current of 13,200 volts. On or about the 17th day of October, 1913, a son of George Gramlich's, a few months past 15 years of age, climbed one of the trees through which the high-tension wires passed, and in some way came in contact therewith and was killed. The tree was on the Gramlich premises, about 18 inches from the fence * * * ."

Contributory negligence was one defense. Due to the child's immature years and his lack of knowledge that he would meet any danger in climbing the tree, it was sufficient, we there said, to justify the court in letting the jury pass on the question.

*Travers v. City of Emmetsburg*, supra, related to an injury on a defective street. Contained in that opinion is the following:

"Again, it is an established rule in this state that, when a city permits a defective street or walk to remain open and un-barricaded, mere knowledge of its general unsafe condition is not, in itself, sufficient to establish contributory negligence on the part of one who has the right to use such street or walk."

*Cawley v. Peoples Gas & Elec. Co.*, supra, involves the location of electric wires in such a way as to come in contact with a telephone wire on which a lineman was working.

"There was no showing in the record that Cawley knew that the current in appellant's wires had been changed from a voltage of 110 to one of 2,300. The evidence shows that a voltage of 110 is comparatively harmless, but that a voltage of 2,300 is dangerous. The evidence also tends to show that the method employed by Cawley to repair the broken wire was the ordinary and usual one employed for said purpose."

*Dillon v. Allegheny County L. Co.*, supra, presents a set of facts where a policeman, performing his duty, sought to move a broken electrically charged wire with his "mace." It was there said he was not guilty of contributory negligence, because

the emergency required that he take unusual steps for the safety and protection of the public.

*Beman v. Iowa Elec. Co.*, supra, embodies these circumstances: Fred Miller, plaintiff's intestate, was a member of a bridge crew, engaged in driving false piling with a hoisting machine and derrick, near a creek over which was extended a high-power electric line. Continuing the discussion in that case, we further said:

"In operating the derrick in question, the boom revolved from one position to another, and there is evidence that, when the top end of the boom was the farthest to the east that it could go, it was 18 inches from the nearest electric wire; and it is the claim of the appellee [administrator] that it was impossible for the end of the boom or any part of the derrick to strike or come in contact with any of the transmission wires. The derrick and boom had been operated in this position for a period of three days before Miller was killed. The boom had been tested, to see how close it would come to the electric wire; and the evidence discloses that none of the men of the bridge crew knew, at the time, that an electric current would escape or jump from an electric wire. The foreman on the job did not realize that there was any danger or any hazard in operating the derrick and boom in the position and in the manner in which it was being operated at the time Miller was electrocuted. Miller and the other workmen were told and directed where to work, and there was a compliance with these orders."

Apparently, the electric current, in opposition to Miller's expectation and anticipation of its habit and action, leaped or jumped from the wire to the boom, and thereby killed him.

XI. Quite different, and, in truth, easily distinguishable, are the facts in those cases just reviewed, from the actions of Murphy in the cause at bar. Confronting the appellant's intestate was no unusual emergency, requiring the relaxation of the ordinary rules of prudent and reasonable conduct. According to the record, he knew of the existence of the "high line" and its voltage of electricity, and he also was cognizant of the fact that, if the telephone wire in his hand came in contact with the electric wire, harm would come to him. Confusion or mistake on Murphy's part does not enter the hypothesis, nor does

any mysterious or not generally known habit of electricity come into the problem. There, too, is entirely absent a situation where the electric spark leaped from one wire to the other through space in a manner or way unexpected or unknown to him. More than this, we are not confronted with a situation where, while his back was turned, or at any other time unknown to him, there was an entanglement of the wires, to his surprise. Very different, too, is this case from one where, because of the very duties of the occupation and the required method of procedure therein, certain dangers are encountered. Dissimilarity appears also between this case and the decisions involving a pedestrian, traveling over a sidewalk known generally to be dangerous, but, in the exercise of proper caution, believed to be safely passable.

Perhaps it was not negligent for the decedent to attempt to place the telephone wire over the "spike" on the electric pole. Manifestly, however, he was guilty of contributory negligence in the method he adopted to accomplish this feat. These "high-line" poles were approximately 150 feet apart. The pole bearing the "spike" was a little to one side of Murphy's wagon, and the wire was sagging to such a degree as to hang within at least 4 feet from the ground. According to the testimony, this "spike" was not more than 2 feet below the electric wires. Of necessity, then, a swing of the telephone wire, produced by Murphy, must have been a sufficient cause for it to take a rainbow shape of such angle that inevitably, when going over the "spike," it would come in contact with the electric wire. Otherwise the telephone wire could not have been placed upon its support through the manner selected. The angle required to complete the loop was itself a condemnation of Murphy's scheme. Any adult, sane man could see and would know this. How, then, could any jury say this was prudent, and the exercise of such care as reasonable men would take? Plainly, it was not, and minds of honest and reasonable men cannot disagree concerning the negligence of Murphy's act, in view of these conditions.

Possibly there might arise situations under which the conduct of plaintiff's intestate would not amount to contributory negligence; but this is not one of them, and we confine our holdings here to the facts of this particular case. As to whether

or not Murphy was either a trespasser or a bare licensee, we find it unnecessary to decide.

Wherefore, the judgment of the district court must be, and hereby is, affirmed.—*Affirmed.*

EVANS, FAVILLE, DE GRAFF, ALBERT, MORLING, and WAGNER, JJ., concur.