STATE, FOR THE USE OF JOSEPH HOFFMAN ET AL., *v.*
POTOMAC EDISON COMPANY.
[No. 92, October Term, 1933.]

*Decided January 18th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Walter L. Clark* and *Roszel C. Thomsen,* with whom were *William Preston Lane, Jr.,* and *Joseph D. Mish* on the brief, for the appellants.

*Alexander Armstrong* and *H. Vernon Eney,* with whom were *Armstrong, Machen & Allen* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Samuel Merle Hoffman, while in the employ of his uncle Joseph M. Hoffman, who was engaged in the business of drilling wells, was, on September 29th, 1932, electrocuted by coming in contact with a guy wire attached to a pole owned

and used by the Potomac Edison Company as part of a line for the transmission of electric current. His widow and children were awarded compensation under the Workmen's Compensation Act (Code, art. 101, sec. 1, as amended), and the Century Indemnity Company, the insurer, is discharging that award. Subsequent to the award, on December 17th, 1932, an action was instituted in the Circuit Court for Washington County in the name of the State, for the use of the employer, the insurer, and the dependent widow and children of the deceased, against the Potomac Edison Company, to recover compensation for his death, on the theory that it was caused by the defendant's negligence. The defendant pleaded the general issue, the case was tried, and, at the conclusion of the plaintiffs' evidence, the court directed a verdict for the defendant, on the ground that the deceased had by his own negligence so far contributed to the accident which caused his death as to bar a recovery. This appeal is from the judgment on that verdict.

The record submits one exception and two questions. The exception is to the granting of defendants' B prayer, which instructed the jury that "Merle Hoffman was guilty of negligence directly contributing to his death," and that their verdict must be for the defendant.

Since the existence of contributory negligence assumes the existence of primary negligence, the questions are: (1) Was the defendant, upon the facts of the case, guilty of primary negligence, and (2) upon the same facts was Samuel Merle Hoffman as a matter of law guilty of contributory negligence? The issue is not as to the law, for that is not questioned, nor as to the facts, for they were not disputed, but as to the application of the law to the facts.

There was in the case evidence tending to prove these facts, which for brevity and convenience are stated in narrative form.

Joseph M. Hoffman, in connection with his drilling work, operated a well-drilling machine and derrick, permanently mounted on a truck. In moving the truck from place to place the derrick folded forward on a hinge or hinges, and projected

from the rear of the truck at a depressed angle over its hood, so that, when folded, the derrick sloped upward from the hood to its highest point, which was at the rear end of the truck. Its highest point, when so folded, was less than thirteen feet four inches above the surface on which the truck wheels rested.

Prior to the accident Joseph Hoffman had finished drilling a well on the property of Spielman's canning factory, and at the time of the accident he was moving the well-drilling machine from that site to a point near Maugansville, and was coming out of the cannery road onto the "state highway." The cannery road is referred to in the testimony as a county road, although no witness could say positively that it was a county road. It is nine feet wide and near Big Pool Station in Washington County, runs in a general easterly and westerly direction parallel to the tracks of the Western Maryland Railroad. Near Big Pool Station it forms a junction with a state highway which continues the same direction. At that point the railroad runs through a cut, and the road, called in the evidence a "state highway," is carried north from the junction over that cut by a bridge. The cannery road approaches the junction at an ascending grade. South of the state road, near and east of the bridge, there was a pole carrying defendant's transmission lines. From that pole a guy wire attached to it stretched across the junction to a tree to which it was also attached, which stood in a field north of the west side of the junction. Branches of the tree extended over part of the road and to some extent hid the wire. The ground in which the tree stood was lower than the surface of the road at its crown, so that, while the point at which the guy wire was attached to the tree was eight feet one inch above the surface of the ground in which it stood, it was but six feet eight inches above the level of a horizontal plane in which lay the highest point of the surface of the road. The guy wire was attached to the pole at a point twenty-one feet seven inches from the ground, and the pole was thirty-nine feet from the tree.

On the morning of the accident, Joseph M. Hoffman was driving the truck on which the drilling machine was mounted, and his nephew, referred to in the evidence as Merle, was following behind him in a small Ford truck. As the uncle was coming out of the cannery road onto the state highway, he felt the truck "sort of jerk" and he "heard something crack." At that time he was going upgrade in low gear, just creeping along at about two miles an hour. To quote him: "I came up to the point where the lane came in to the macadam road; I was in low gear and I kept on going, I didn't stop; the very first thing that attracted my attention to indicate that something had occurred was when the pole broke, and the truck seemed as if it kind of winced, and I thought something about the truck had broken and I stopped, I was only creeping along, about two miles an hour. The cab is open on that side and I noticed the pole like that lodged right back of the cab. I looked out through the windshield and I noticed the wire and I thought it was a Western Maryland private phone wire; and I thought to myself, I am in for it now, probably tie up traffic. I made as if to get out and the truck made as if to move and I pulled back a notch on the emergency brake and jumped out. I didn't do it in a hurry. I felt this shock when I hit the road. Merle was following close with the little truck. He was just below that rise. I got out on the left side. When I jumped out I felt this shock. It seemed as if my legs were numb and I caught myself on my hands in the grass and I got up; he had already gotten up on the truck and took hold of this cable like that." What had happened was that the guy wire had come in contact with the derrick at a point eleven feet five inches above the surface of the road, slid backward up the derrick, which sloped upward, for about four feet, where it was caught and held by a device known as a "bullhead" at eleven feet ten inches above the road. The fall of the pole broke the transmission wires, which carried electric current at a pressure of 6,900 volts, and the broken ends dangled over and in the railroad cut, and there they came in contact with the ground, sparkled, and burned.

When Joseph Hoffman stopped, Merle, who was in the Ford truck, also stopped, climbed on the truck, seized the guy wire in his hands, and freed it from the "bullhead," and was still on the truck when his uncle jumped to the ground. When he struck the ground he felt as if his legs "were numb," and as though he had a shock. He at once called to his nephew to leave the truck. To quote his testimony: "Merle was already up on the machine and had hold of this cable and he had loosened it. I mean the guy wire referred to. He had loosened it, and that caused it to sag down between the machine and the tree. Before it was loosened it was tight. It was about a man's height after he had loosened it. Merle had hold of the guy wire; it had caught on a bull head; and that caused it to sag down. I told him to get down, that the truck was evidently charged because I had got a shock." When Joseph "hit the road," he said "that must be a hot line up there," and Merle answered, "I say it's hot, look at it burning down there." At the time of the accident several school children were present, and William F. Kline, driving a horse and wagon, was approaching over the state road from the direction of Big Pool. Joseph Hoffman, fearing that the bridge might be charged and that the children might cross it and be injured, to prevent injury to them or others, decided to go to Big Pool and notify the power company of the accident, and request them to cut off the current. Before going on that errand he told Merle to watch and see that the children did not come in contact with the bridge, and warned him not to touch anything "pertaining to the truck," that it was charged. In the meantime the fallen pole, the sagging wire, and the truck blocked the road, so that Kline approaching from the west had stopped.

After Joseph Hoffman had gone, Merle came from behind the truck, walked on the left of it towards Kline, and as he passed the guy wire, which was sagging down at about the level of his chin, he put up his hand as if to push it out of his way, and instantly received the shock which killed him. Kline said that Merle had not spoken to him before the acci-

dent. But Roy Snyder and Leon Turner, two of the school children, testified that Merle had asked Kline if he wanted to get by; and Kline had answered that he could wait. They also said that before Joseph Hoffman had left to warn the power company he had told Merle "not to touch anything," that "everything was charged," and that Merle had himself told them "not to touch anything."

For the purposes of this case these facts and all inferences legitimately deducible therefrom which support the plaintiffs' right to recover are conceded. The first question to be considered in connection with them is whether they afford legally sufficient evidence of primary negligence on the part of the defendant.

It may well be doubted whether the evidence was legally sufficient to support the inference that the cannery road was a public highway. Joseph Hoffman testified that he could not say whether it was anything more than a private road to the Spielman cannery. Kline said that it led only as far as the Spielman farms, and there was no evidence of any such general and continued usage as would fix its character as a public highway. But, in view of the fact that the point at which the derrick fouled the guy wire was within the limits of what was referred to as a state highway, the point is not material. The photographs indicate that it was within those limits, and the testimony of Joseph Hoffman is to the same effect. So that the ultimate question is whether negligence may be inferred from the fact that the defendant maintained a wire stretched across the highway at a height of eleven feet five inches above the surface thereof.

A highway is a public road, street or way, dedicated to every lawful and reasonable use to which it may be put by the public at large for purposes of transportation or travel. Such a use is usually held to be lawful and reasonable so long as it does not interfere with or endanger others lawfully and reasonably engaged in the use of the way. The question as to what is a lawful and reasonable use is in the nature of things naturally affected by changes in methods

of transportation, and by the needs of those who must be served by the ways. So, in rural territory, such ways must be used for the passage of traction engines, threshers and well-drilling machines, for in no other convenient or practical way could persons in such areas secure the mechanical utilities essential to the reasonable and convenient use of their respective properties, and the use of the public highways for the passage of such engines and machines in a reasonably careful and prudent manner is neither unreasonable nor unlawful. 29 *C. J., "Highways,"* secs. 410, 411. Consistently with that principle, it has been held that corporations or others who have secured permission to obstruct any portion of a highway by the erection of permanent fixtures, such as poles and wires, must so place them as not to interfere with or endanger others who may be in the lawful and reasonable use of such ways for purposes of travel or transportation, which may include moving such vehicles as traction engines and well-drilling machines.

In stating that rule, *Elliott,* in his *Roads and Streets,* sec. 1072, says: "An electric light company which so places a guy rope as to make it dangerous to the employees of a steam railroad to operate the trains of such railroad is guilty of negligence. The duty of an electric company is to so string its wires as to protect or not injure those rightfully using a highway from injury thereby. An electric company which suffers a wire to sag down over a highway, and thereby causes injury to a person using the highway, and free from contributory negligence, is liable to the person injured, and it is not incumbent upon the plaintiff in such a case to prove that the company had actual notice of the situation of the wire; for if it had been in that condition for such a length of time as to charge the company with notice, it is liable without proof of actual notice." To the same effect is *Earp v. Phelps,* 120 Md. 282, 287, 87 A. 806, 808, where this court said: "In the decision of such a question as the one now under consideration, the fundamental rule to be kept in mind is that the use of a public road for the maintenance of telegraph

poles and similar structures is subordinate to the purposes of public travel for which the road is primarily intended. The statute authorizing corporations to construct their lines along and upon the highways and across the bridges and waters of the state, by the erection of the necessary fixtures, provides that they 'shall not be so constructed as to incommode injuriously the public use of said postal roads or postal routes, roads, highways and bridges, or injuriously interrupt the navigation of said waters, or interfere with the convenience of any landowner more than is unavoidable.' Code 1904, art. 23, sec. 324; Annotated Code 1912, art. 23, sec. 359. * * * The appellant's brief contains a suggestion that the prohibition of the act was merely that the public use of the roads shall not be injuriously incommoded more than is unavoidable. We do not so construe the meaning of the statute. The term 'unavoidable' is plainly intended to qualify only the restriction upon interference with the convenience of landowners and has no relation to the provision against incommoding the public use, to which the adverb 'injuriously' is applied." See, also, *Phelps v. Howard County,* 117 Md. 180, 82 A. 1058.

Because of the nature of the territory through which the highway runs, the defendant, in the exercise of ordinary prudence and foresight in stretching its guy wire across it, was required to anticipate that the road might be used for the passage of such machines as that operated by Joseph Hoffman, and to place it so as not to interfere with that or any reasonable use of the highway. Whether in this case it did exercise such prudence and foresight, and whether Joseph Hoffman's use of the road was reasonable, were not questions of law, but questions of fact for the jury, for the facts stated were legally sufficient to permit an inference of primary negligence.

Appellee's contention in respect to contributory negligence is that Samuel Merle Hoffman's act in touching, or in coming near enough to the guy wire to receive the shock which killed him, was such a glaring act of negligence as would

have barred his right to recover had he lived, and which therefore bars the right of the appellants to recover for the loss resulting to them from his death. In support of that contention they cite a number of cases decided by this court as well as cases from other jurisdictions. *Cumberland v. Lottig,* 95 Md. 42, 51 A. 841; *State v. Crisfield Ice Mfg. Co.,* 118 Md. 521, 85 A. 615; *State, use of Bell, v. Eastern Shore Gas, etc. Co.,* 155 Md. 660, 142 A. 503; *State, use of Bahner, v. Consol. Gas etc. Co.,* 159 Md. 138, 150 A. 452; *Druse v. Pacific Pow. & Lt. Co.,* 86 Wash. 519, 150 P. 1182; *Dorough v. Alabama Power Co.,* 200 Ala. 605, 76 So. 963; *Haertel v. Pennsylvania Lt. & Pow. Co.,* 219 Pa. 640, 69 A. 282; *Shade v. Bay Counties Power Co.,* 152 Cal. 10, 92 P. 62; *City of Owensboro v. Winfrey,* 191 Ky. 106, 229 S. W. 135; *Murphy v. Iowa Electric Co.,* 206 Iowa, 567, 220 N. W. 360; *Aljoe v. Penn Cent. Lt. & Pow. Co.,* 281 Pa. 368, 126 A. 759. An examination of those cases, however, shows that in each instance they dealt with facts which showed that the injuries complained of resulted from a negligent contact by the injured person with a wire which he either knew, or in the exercise of ordinary care and prudence was bound to know, was dangerous and probably deadly. The rule that, where such facts exist, negligence will be presumed as a matter of law, is no longer open to question in this state, nor is it denied by the appellants. But the question here is not whether the man who was killed was negligent in touching or coming near to a wire which he knew or should in the exercise of due care have known to be dangerous, but whether upon the facts stated above he was bound as a matter of law to know that it was dangerous or possibly deadly. If he knew or should have known that the wire was dangerous, it follows as of course that he was negligent in touching it, or in coming near enough to it to receive the shock. If he neither knew nor was as a matter of law bound to know that, then whether he was negligent was a jury question.

In this case, at the time of his death, the injured man, for some reason not disclosed, was passing under the sagging guy wire between the truck and the tree to which the wire was

attached. He knew that the other wires, the broken transmission wires which hung down on the railroad side of the truck, were sparking and burning the grass, and that they were dangerous; he had been told too that the truck was charged with electricity and dangerous. In the absence of proof to the contrary, it might have been inferred, from the known disposition of men to avoid injury to themselves, that he did not in fact know that the guy wire was dangerous, or he would not have touched it. *Northern Central R. Co. v. Geis*, 31 Md. 364. So that the controlling question is whether the circumstances were such as to charge him with constructive knowledge of the dangerous character of the guy wire, as a matter of law. The answer to it depends largely upon the weight to be given the conceded fact that a few minutes before the accident Merle had handled that particular wire without harm to himself. He was a young man nineteen years of age, he had had, so far as shown by the evidence, no experience in handling electrical appliances, but as a matter of common and general knowledge he may be presumed to have known that ordinarily no electric current was transmitted by or through the guy wire, and also that such current was transmitted through the feed or transmission wires. He knew, too, that the pole to which the transmission lines had been attached rested upon the cab of the truck. The evidence fails to show that the transmission lines were in contact either with the truck or with the guy wire, which, after Merle freed it from the "bullhead", "sagged down" over the wooden beam of the derrick.

The most direct evidence as to the position of the broken wires with reference to the truck was that of two schoolboys, Roy Snyder and Leon Turner, aged eleven and ten years, respectively. Roy Snyder said: "Those wires were sparking in the grass. On the right side, on the side I was on. They were down along the bank. Those wires that were sparking in the grass were not attached to the pole that fell over. The wires that were sparking in the grass were broken off from this pole where they hooked on to this pole and broke on the other side. Those wires had been stretched across the rail-

road tracks. They were broken in two. All of them was broken right in the middle from the other pole across the railroad track. The wires were broken from the other pole over here. On this side of the bridge laying down along the bank. The wires on the other side of the pole were fastened up." Leon Turner said: "Two wires that were on those poles were broken, and they were on the grass on the right-hand side of the cut. I did not see any wire on the truck, or touching the truck, except the guy wire. That was the only wire that came down and touched the truck. That was resting on the top. That is the wire that he touched. The pole fell over; there were wires still fast to the pole. There were some wires fast to the pole laying down over the bank. They had been broken loose from the pole. I didn't see any wires still fastened to the pole. The wires were broken on both sides of the pole that fell over. They were broken off the pole. The wires were broken and the ends fastened to the pole fell. But those ends were not touching the truck; they were over the bank." Joseph Hoffman testified: "The power lines were broken between that pole and ones on the other pole. I couldn't tell whether those power lines were touching my truck. I couldn't tell whether they were touching the guy wire. I do not know in what way my truck was being charged; it was steel dash truck, steel floor-boards in it and metal throughout the machine, metal drilling tools," etc.

From that testimony it may be inferred that there was no visible connection between the transmission wires and the guy wire or the truck, and that, since Merle knew that the truck was charged, he should also have known that the guy wire was charged, because, as it was the only wire which touched it, the truck could have been charged in no other way. But, on the other hand, weight must be given to the fact that he had handled that particular wire shortly before and had received no shock, as justifying a belief on his part that it was not charged, and that the truck, if charged, was charged from some other source.

Ordinarily the existence of contributory negligence is a

jury question, and it is only when the facts, and all permissible inferences deducible therefrom, leave no other conclusion open than that the plaintiff himself contributed to the accident of which he complains by some act, so prominent and decisive in its character as to leave no room in the minds of men of ordinary prudence for doubt as to its recklessness and imprudence, that the question will be withdrawn from the jury. Carter's Digest, title "Negligence," subtitle "Actions." Conversely, where the facts and all inferences legitimately deducible therefrom permit no rational conclusion other than that the negligence of the plaintiff directly contributed to the happening of the accident, it becomes the duty of the court to so instruct the jury. *Id.*

Applying these principles to the facts stated, it cannot, in the opinion of a majority of the court, be fairly said that the appellant was guilty of negligence as a matter of law. To hold that, because he knew or had been told that the truck was charged, and that electric current was flowing through the transmission wires attached to the pole which lay on the truck, he must as a matter of law be charged with knowledge that the guy wire was also charged and dangerous, would be to place an unreasonable burden on him, in view of the facts that he had handled that identical wire while standing on the truck without injury, that there had been no change in its position or that of the truck since he had handled it, and that he had had no other warning or notice that it too was charged. He undoubtedly knew of the deadliness of the other wires, but from his own actual experience in physically handling the guy wire he had at least some reason to believe that it was harmless.

And, while he had been told that the truck was charged, he had some reason to doubt that too, for he had stood on the truck while freeing the guy wire from the "bullhead", and had received no shock, nor did it appear that his uncle had been shocked while on the truck, but when he first touched the ground after leaving it. There was no explanation of the fact that he was not shocked while standing on the truck in contact with the guy wire, nor can it be definitely said that

it was charged at that time. It was suggested in argument that the rubber tires of the truck may have insulated the truck from the ground, but the guy wire was not broken and was still attached to the tree, and it did not conclusively appear whether its connection with the tree was insulated.

From all of these facts, while the jury might have inferred that Merle was guilty of contributory negligence in touching any wire connected with the pole which lay on the truck, in the opinion of a majority of the court they were not sufficient to charge one of Merle's age and experience with knowledge, as a matter of law, that the wire he had handled without harm so shortly before was dangerous. It follows, therefore, that there was error in granting the appellee's B prayer, and that the judgment appealed from must be reversed.

*Judgment reversed, with costs.*

PARKE and SLOAN, JJ., dissent.