EASTERN CONTRACTORS, INC., Use of Itself
AND Federal Insurance Company *v.*
ZINKAND et al.

[No. 88, October Term, 1951.]

*Decided February 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Paul R. Kach,* with whom was *F. Edward Wheeler* on the brief, for the appellant.

*William D. Macmillan* and *William A. Fisher, Jr.,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a judgment for defendant on "Motion for a directed verdict" in a negligence case tried before the court without a jury. The rules of practice and procedure do not provide for a directed verdict in a nonjury case. Trials Rule 5, Demurrer to Evidence, authorizes a motion, "at the close of the evidence offered by an opponent for a dismissal on the ground that upon the facts and the law he has shown no right to relief." In the Reporter's Explanatory Notes to the rules it is stated, "Rule 5 merely provides the equivalent of a directed verdict in cases tried by the court alone pursuant to Trial Rule 9". Code, 1947 Supp., page 2075. Whether Rule 5 may in any event provide more or less than the exact equivalent of a directed verdict, we need not consider. From the record

it is clear that the court regarded the "motion for a directed verdict" as involving only the legal sufficiency of the evidence; we shall so regard it.

Plaintiff sued for damages to his truck by collision with defendant's truck. Defendant counterclaimed for damages to his truck in the same collision. On defendant's motion, at the close of plaintiff's evidence, judgment was entered for defendant in the original case and for the cross-defendant on the counter-claim. The motion apparently was made and granted on the ground of lack of evidence of negligence of defendant and clear evidence of contributory negligence on plaintiff's part.

The collision occurred at Friendship Airport, while it was in course of construction and not open to the public, on or near the airplane taxiway, which was being constructed or paved with asphalt. The taxiway was not, properly speaking, a road, but paved with asphalt it could readily be used for passage by surface vehicles of less delicate construction than airplanes. It was about two hundred feet wide, ran in a straight line approximately east and west, and had been completed, for four or five hundred feet east from an asphalt plant. At the time of the collision plaintiff's truck was hauling about twelve tons of hot asphalt from the plant to the east end of the then finished part of the taxiway. It was running about twenty to twenty-five miles an hour, and was about one hundred feet from the east end of the then finished part of the taxiway. From six o'clock in the morning till about four in the afternoon, the time of the collision, plaintiff's truck had been running up and down the taxiway, carrying hot asphalt from the asphalt plant to the east end of the finished part of the taxiway and dumping the asphalt beside the taxiway to be used in finishing more of the east end.

A road, which is referred to as the "circle way" and apparently was, or connected with, a highway outside the airport grounds, curved from the southeast into the east end of the taxiway. Apparently some other road curved into the west end of the taxiway near the

asphalt plant. The business relations, if any, between plaintiff and defendant, or either and other contractors or the principal contractor, if any, are not shown by the evidence.

Plaintiff's chauffeur says he was told to keep to the left side of the road. The foreman said, "Keep them heavy trucks off the middle, away from the asphalt, because it specks up and busts the middle. Stay on the edge, the edge is easy to repair. Let the other trucks coming in stay on the right hand side [*i.e.*, the right hand side looking east]." The chauffeur says, "Where I saw this truck [defendant's] coming over the hill, I thought he was going the way the rest was going. * * * I didn't pay him no mind. * * * When I taken notice, I heard his brakes crying. I seen him coming to the cab. I cut hard to the left. That broke my steering arm. I ran off to the left." Plaintiff's truck was struck "right behind the cab". Plaintiff's chauffeur had driven off the air-strip [taxiway] "about forty or fifty feet" before the accident occurred. "The brakes crying. That's what made me pay attention to it. * * * He was skidding into me. * * * [After the accident, the driver] "told me the brakes locked. * * * On that special day we didn't pull to the right, stayed on the left that day." At the time of the accident defendant's truck apparently was carrying stone to the asphalt plant. There is no evidence whether this was the first or the twenty-first trip defendant's truck made at Friendship Airport that day or ever or what, if anything, or by whom, defendant's chauffeur had been told about keeping to his left and allowing the asphalt truck to use their left hand side of the taxiway. Another witness testified that plaintiff's truck was off the left edge, "because he was hit right at the cowl of the truck on the right hand side of the truck". Another witness testified that he was hauling stone into the airport, during the day he passed asphalt trucks, coming from the asphalt plant. "They were travelling to the left of the road. * * * I travelled to my left * * * every time I came in [that day]."

A witness Eisenhower testified to the same effect. He was hauling stone to the asphalt plant. He had made six or seven loads that day. "Well, nobody told me where to travel at, but when I came in I always watched myself for asphalt trucks, and gave them the right of way and I always kept away from them as I came into the airport; and I noticed the trucks were coming up on that side of the road, * * * and I always kept to my left and kept out of their way. It was hot stuff, and they was supposed to get to the machine as quick as they could and get back to the plant, to keep the plant going. I kept out of their way, no matter where they was at." On cross-examination, Eisenhower testified, it was apparent that plaintiff's truck had turned to its left off the runway into the plot, "but he was right at the edge of the runway. He didn't have far to turn. Q. And the other truck had turned into the right as if to avoid a head-on collision. A. That's it, yes, sir."

Plaintiff contends that (a) the taxiway was of ample width to permit the asphalt trucks to use the left hand side (looking east) and the other trucks to use the right hand side, (b) asphalt trucks, including plaintiff's truck, were clearly visible to other trucks at a great distance, (c) it was obviously advantageous for asphalt trucks to take the shortest route, a straight line, between their source and their destination, and easy for other trucks to avoid them. These contentions are by no means without force. Section 136 of Article 66½ of the Code provides that nothing in that Article shall prevent the owner of real property, used by the public for vehicular traffic by permission of the owner and not by right, from prohibiting such use, or from requiring other or different or additional conditions than those specified in that Article, or otherwise regulating such use as may seem best to such owner. Section 162, requiring that "upon all roadways of sufficient width" a vehicle shall be driven upon the right half of the roadway, is applicable, by the definition of "roadway", section 2 (46), only to "highways", i. e., public ways.

*State v. Potomac Edison Co.,* 166 Md. 138, 144, 170 A. 568. The Friendship taxiway presumably never has become a highway except for airplanes. When it was in course of construction, it was not a highway for automobiles. If all other users of the land for vehicular traffic had been effectively notified by the landowner, or the principal contractor, if any, or some other representative of the owner, or without notice had, by observation or otherwise, acquired as much knowledge as Eisenhower evidently had, plaintiff might have had a right to drive his truck where it was driven, and defendant might have had a duty to avoid plaintiff's truck, and plaintiff's chauffeur perhaps might have assumed that defendant would avoid him. On these questions we express no opinion. But the evidence falls short of this hypothesis—or the law falls short of what the evidence actually shows. Older than statutory rules of the road, and of broader application, were, and still are (where statutes are inapplicable), the customs of the road or the customary rules of the road. It has been held that on private roads (where no statute is applicable) exercise of due care requires passing on the right in circumstances analogous to those covered by statute. *Sills v. Forbes,* 33 Cal. App 2d 219, 228-229, 91 P. 2d 246; *LaPosta v. Himmer,* 358 Pa. 69, 72-73, 55 A. 2d 751; *Petersen v. Jansen,* 236 Wis. 292, 295 N. W. 30. Some courts may seem to say that the custom of the road, like section 162 of Article 66½, required driving upon the right half of the road, (but only when passing a vehicle or pedestrian coming in the opposite direction), but it appears upon close examination of the authorities that the custom of the road did not forbid driving on the left hand side of the road but only required passing to the right of the approaching vehicle. *Palmer v. Barker,* 1834, 11 Me. 338, 339; *McLane v. Sharpe,* 1838, 2 Harr. (Del.) 481, 483; *McDonald v. Yoder,* 80 Kans. 25, 27, 101 P. 468; *Wright v. Fleischman,* 41 Misc. 533, 85 N. Y. S. 62. This view of the authorities accords with the recollection of those who

remember the Nineteenth Century and with photographs
and other illustrations of highway scenes, especially
of city streets. Whether the custom of the road required
only passing on the right, and not driving on the right
hand side of the road, if as Eisenhower's cross-examina-
tion indicates, plaintiff's and defendant's trucks were
both driving on plaintiff's extreme left and defendant's
extreme right, and both at the last moment turned,
to avoid a head-on collision, and turned into an almost
head-on collision, we cannot escape the conclusion that,
whether defendant was negligent or not, plaintiff, whose
chauffeur "didn't pay him no mind", until he "heard
his brakes crying" is barred from recovery by con-
tributory negligence.

It is not clear to all the members of this court that
the accident happened in just the way the Eisenhower
cross-examination seems to indicate. But it is im-
possible to say from the evidence that it happened in a
different way, *e.g.*, by defendant trying to cut diagonally
across plaintiff's path. At the trial a plat was offered
in evidence and exhibited on a blackboard. The wit-
nesses testified with frequent references to the plat
and the board. Eisenhower was asked whether he could
indicate on the board "just how they were facing". He
said he could; "in my opinion the accident happened
right about here. Zinkand's truck was facing this
way. Eastern Contractors' truck was facing this way,
about like that." Plaintiff's chauffeur gave a similar
answer to a similar question. These answers, we may
assume, were clear to the trial judge, but without the
blackboard or the witnesses' explanatory pointings, they
are unintelligible to us.

On motion for a directed verdict for defendant we
must take the view of the testimony, *i. e.*, draw the legiti-
mate inferences, most favorable to the plaintiff. But
we can make no such assumption as to what the testimony
actually was, when it is not intelligibly reproduced be-
fore us. When we do not know what the testimony

actually was, we must assume that it was consistent with the judge's decision and not contrary to the decision.

*Judgment affirmed, with costs.*