THE STATE OF MARYLAND, use of ANNIE STEEVER, and others *vs.* THE UNION RAILROAD COMPANY OF BALTIMORE, and the PHILADELPHIA, WILMINGTON AND BALTIMORE RAILROAD COMPANY.

*Railroad company—Negligence—Railroad crossing—Death from being Struck by Engine—Absence of Signal of Approach—Withdrawal of Case from Jury—Province of Jury—Credibility of Witnesses and Weight of Testimony.*

In an action against a railroad company to recover damages for the killing of a person, it appeared that the deceased, a skillful driver, was driving along a turnpike towards a railroad crossing on a dark, rainy night, at a time when there was no reason to expect a train or engine; while crossing the track he was killed by an engine and tender going down grade at the rate of from twelve to fifteen miles an hour, no steam being used. The engine made no noise, and gave no signal of its approach; and there was no light on it which could be seen; nor was any notice given to the deceased by the watchman at the crossing whose duty it was to give warning. If the deceased had stopped, looked, and listened any number of times, there was nothing which could have been seen or heard. HELD:

That this evidence did not show negligence on the part of the deceased, and the case should not have been withdrawn from the jury.

In this State it is the exclusive province of the jury to decide on the credibility of witnesses, and to determine the weight of testimony.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*Exception.*—The plaintiffs offered the five following prayers:

1. If the jury find from the evidence that Daniel Steever, on the 24th day of July, 1887, while crossing

State, use of Steever *vs.* Union Railroad Co. of Baltimore, *et al.*

the railroad tracks of the Union Railroad Company upon the Baltimore and Havre de Grace Turnpike, was run into and killed by an engine and tender of the Phil., Wilm. & Balto. Railroad, operated by its servants on said road, and that the equitable plaintiffs are related to the said Steever in the manner set forth in the pleadings in this cause, and that the said killing resulted directly from the want of exercise of ordinary care and prudence on the part of the defendants, or either of them, or of the servant or servants of either of them, and not from the want of ordinary care and prudence on the part of the deceased, directly contributing to the accident, then the equitable plaintiffs, Annie Steever, Nellie Healy and Daniel Steever, Jr., are entitled to recover.

2. If the jury find for the said plaintiffs named, in and under the instructions contained in the first prayer, their verdict must be against that defendant only which they may believe to have been guilty of such negligence, or against both defendants, if they shall find both to have been so guilty.

3. If the jury find from the evidence that there was negligence on the part of the defendants, or either of them, which contributed to the accident by which said Steever was killed, then in order to defeat a recovery in this suit on the ground of contributory negligence upon the part of the deceased, the burden of proof is upon the defendants to show that the deceased was guilty of negligence, and that such negligence on his part directly contributed to produce the injury.

4. If the jury shall find for the equitable plaintiffs named in plaintiffs' first prayer, then in assessing the damages they are to estimate the reasonable probabilities of the life of the deceased, and give the said equitable plaintiffs such pecuniary damages not only for the past losses, but for such prospective damages as the

State. use of Steever *vs.* Union Railroad Co. of Baltimore, *et al.*

jury may find that they have suffered, or will suffer, as the direct consequence of the death of the said Daniel Steever.

5. If the jury shall find for the equitable plaintiffs, then in awarding the damages to which they are entitled, they must apportion the same among the equitable plaintiffs for whom they so find in such shares respectively, as they shall find and direct.

The defendants asked the following instruction:

That the burden of proof is upon the plaintiffs to show not only that there was negligence on the part of the servants of the defendants, but also that such negligence was the cause of the injury complained of, and inasmuch as there is no legally sufficient evidence in this case that the acts of negligence of the servants of either of the defendants, testified to by plaintiffs' witnesses, or any of such acts of negligence, were the cause of the injury complained of, the plaintiff is not entitled to recover, and the verdict of the jury must be for the defendants.

The Court (BROWN, C. J.) rejected the plaintiffs' prayers, and granted the prayer of the defendants. The plaintiffs excepted, and the verdict and judgment being for the defendants this appeal was taken.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, BRYAN, and McSHERRY, J.

*George Blakistone,* and *T. Wallis Blakistone,* for the appellants.

*John J. Donaldson,* and *Bernard Carter,* for the appellees.

BRYAN, J. delivered the opinion of the Court.

The Philadelphia turnpike road crosses the track of the Union Railroad Company a short distance from the

City of Baltimore. It appeared at the trial below that Daniel Steever was driving along the turnpike in a buggy, and was killed while attempting to cross the railroad track. This track is used both by the Union Railroad and by the Philadelphia, Wilmington and Baltimore Railroad. ' The Court instructed the jury, in substance, that there was no evidence that the death was caused by the negligence of either of the railroad companies.

The accident occurred on a dark rainy night about nine o'clock. An engine and tender were coming down the road towards the crossing, running backwards, at a rate of speed, variously stated by defendant's witnesses to be from twelve to fifteen miles an hour. No steam was used; but the engine and tender were going down grade. So far there is no conflict in the evidence. A witness for the plaintiffs (named Cassiday) testified that he was present at the time of the accident, and that no whistle was blown, and no bell was rung, and that there was no light on the back of the tender as it was approaching; but that after the engine had crossed the turnpike and stopped some distance down, there was a little light from the headlight. He is distinctly contradicted by Mitchell, Linthicum, Roff, Rodgers and O'Connor, witnesses for defendants; O'Connor being the watchman at the crossing, and the other four being on the engine and tender at the time of the accident. It was the duty of the persons in charge of the locomotive, in approaching the crossing, "to give proper and sufficient signals of their approach, and to take all reasonable precaution to avoid collision. Failure in the strict performance of these duties to the public, whereby injury is inflicted on individuals, will subject the company to liability to respond in damages to the injured party." *Phila., Wilm. & Balto. Railroad Co. vs. Hogeland,* 66

*Md.*, 160.   There is an irreconcilable conflict in the evidence, which it was the function of the jury to settle.   But it is necessary to consider the other evidence in the cause, to ascertain whether the deceased contributed by his own negligence to cause the disaster.   He and a companion were in a buggy driving down the turnpike, and as they were both killed it is impossible to know with certainty what precautions they took to avoid the accident, or whether they took any.   Cassiday says: "I did not see no buggy.   I heard no noise, only just the motion of the engine coming, there was no whistle blowed at all, nor there was not any bell ringing."   And in another portion of his testimony, he says: "after the engine came, it struck the buggy in front; it didn't hurt the horse at all; it just broke the buggy, and knocked the men on one side of the road, and the watchman who was standing in the doorway with his lamp in his hand, he had to jump on the other side of the house there to get out of the way to keep from getting hurt; the house of which I spoke is his watch box; this is situated on the right hand side of the road as you go out, and on this side of the railroad; the box is about ten or twelve feet from the middle of the pike, he jumped on the other side of the box away from the pike; I didn't see him anywhere else at the moment of the accident, or just before it than in the door of the watchman's box; the door of the box faces the railroad;" he also says: "the accident occurred very close to the watch box, and not in the middle of the road; I did not see any signals on the part of the watchman; in fact he was just coming out; it had been raining, and I think he went in to get out of the rain; the engine was backing, and there was no light on the tender on the back of it, as it was approaching; when the engine stopped, then we had a little light from the headlight;

it had gone across the road and stopped some distance down." On cross examination he said: "when I first saw the engine it was about twenty or thirty feet, may be, away from us; I was standing then right on the pike, on the left hand side as you go out of town; about three or four feet, I guess, from the left hand side of the pike, and I guess about four or five feet from the nearest railroad—right near; I didn't see the engine until it got right close to me; I didn't take very long to get up to the crossing; it may have been a minute or two; I didn't see or hear the wagon that was struck, until the engine struck it; I didn't hear any voices until I saw the watchman standing in the door of the watch-box when I got there; when I got there first he was coming out of the box; I did not see him at all when I got there; I was there a couple of minutes and saw him coming out of the box; it was not over a minute or two—about a minute I guess, before the engine came; the watchman didn't do anything, as I seen, only to get out of the way to protect himself; that was all I could see him do; I saw him at the door of the watch-box, just about a minute, I guess, before the engine came; he had his lantern in his hand; he was standing still; it appeared to me like he was about shutting the door after coming out; he had to get out of the way, and he did get out of the way, too." North, a witness for plaintiffs, testified as follows: " I passed the crossing at about nine o'clock, or five minutes past; was a very dark, rainy night; saw no one at the crossing; saw a light hanging on the watch-box—a small hand lantern, noticed particularly on account of night being very dark and rainy, and saw no one around watch-box; stopped for awhile under trestle on other branch of Union Railroad; don't know whether I heard a train while there or not, did not pay any attention." And Scott another witness

testified as follows: "Was driving up the road behind Steever; got ahead of him about a mile from crossing; passed crossing in neighborhood of nine o'clock; did not see anybody at crossing; did not see or hear any train; passed North's buggy under bridge; pulled up at Wever's, thinking Steever behind me; while there heard a train cross; heard whistle below crossing; Philadelphia road shelled, very noiseless, especially when raining; night was very dark; Steever was one of the most careful drivers I ever rode with." Assuming the truth of this evidence, it does not show any negligence on the part of the deceased. According to it, he was driving along a public road towards a railroad crossing at a time when there was no reason to expect a train or engine; the night was dark; the engine made no noise, and gave no signal of its approach, and there was no light on it which could be seen; nor was any notice given to him by the watchman whose duty it was to give warning. If he had stopped, looked and listened any number of times, there was nothing which could be seen or heard. The evidence being that he was a very careful driver, it would not be reasonable to assume without proof that he neglected the precautions which men of ordinary prudence would take. According to the plaintiffs' proof these precautions would have been unavailing. The evidence of the witness Cassiday is most distinctly and positively contradicted by O'Connor, a witness for the defendants; and testimony is given by O'Connor in serious impeachment of his veracity. And as said before, Cassiday is contradicted by the persons who were on the engine and tender. But this state of the evidence does not take the case from the jury, and refer it to the Court for decision. Contributory negligence on the part of the deceased was matter of defence, and it was incumbent on the defendants to establish it by

proof.   In the case of *State, use of Bacon vs. Balto. &
Potomac Railroad Co.*, 58 *Md.*, 485, it was said: "While
it is perfectly true, that where the plaintiff adduces
evidence which, if uncontradicted, would justify and
sustain a verdict, no amount of contradictory evidence,
however strong, will justify the Court in withdrawing
the case from the jury; yet, if it be proved, as part of
the plaintiff's case, or if it be otherwise proved, and
not controverted, or denied by the plaintiff, that the
party injured or killed was clearly guilty of negligence
in the occurrence of the accident, and that such acci-
dent would not have occurred but for the negligence
of the party injured directly contributing thereto; in
such case, the defendant is entitled to have the jury
instructed that their verdict must be for the defend-
ant." The circumstances justifying a withdrawal of
the case from the jury do not exist in this case, and
the ruling just mentioned is decisive of the present
question.   We perceive no error in the prayers offered
on the part of the plaintiffs.

It was said by the counsel for the appellees that the
evidence of Cassiday was untrustworthy, and was over-
whelmingly contradicted by the other witnesses in the
cause, and that for this reason it was the duty of the
Court to take the case from the jury.   And in support
of this proposition, they cited several cases from the
Supreme Court of the United States.   In the last
of these decisions in point of time, the opinion of the
Court is thus stated; and it is the language of pre-
vious decisions of the Court: "It is the settled law
of this Court, that, when the evidence given at the
trial, with all the inferences which the jury could jus-
tifiably draw from it, is insufficient to support a ver-
dict for the plaintiff, so that such a verdict, if returned,
must be set aside, the Court is not bound to submit
the case to the jury, but may direct a verdict for the

State, use of Steever *vs.* Union Railroad Co. of Baltimore, *et al.*

defendant." *Schofield vs. Chicago and St. Paul Railway Co.*, 114 *U. S.*, 618. This ruling was not intended to declare, and cannot be fairly construed to mean, that the Court ought to assume the power of judging of the credibility of witnesses, or of deciding on the weight of testimony in cases of discrepancy. One of the cases cited in the opinion is *Pleasants vs. Fant,* 22 *Wallace,* 122. This case arose in the Circuit Court of the United States for Maryland, and it was there ruled that there was no evidence on which the plaintiff could recover. In the opinion of the Supreme Court it was said, "it is the province of the Court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether on all the evidence, the preponderating weight is in his favor; that is the business of the jury; but conceding to all the evidence offered the greatest probative force, which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not; then it is the duty of the Court after a verdict, to set it aside and grant a new trial," and in the same connection this language was used: "We hold the true principle to be, that if the Court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the Court should say so to the jury." This seems to be substantially what the Courts of this State mean, when they instruct the jury that the evidence is legally insufficient to sustain a verdict. But whatever may be the ruling of Courts elsewhere, it has been held in this State, as an axiom of the law, ever since the institution of Courts of justice, that it is the exclusive province of the jury to decide on the credibility of

witnesses, and to determine the weight of testimony. And by this rule we shall abide.

> *Judgment reversed, and*
> *new trial ordered.*