POTOMAC EDISON COMPANY *v.* STATE, USE OF
JOSEPH M. HOFFMAN ET AL.

[No. 77, October Term, 1934.]

*Decided January 25th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Alexander Armstrong* and *H. Vernon Eney,* with whom were *Armstrong, Machen & Allen* on the brief, for the appellant.

*Walter L. Clark* and *Roszel C. Thomsen,* with whom were *William Preston Lane, Jr.,* and *Joseph D. Mish,* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

This case was tried twice in the Circuit Court for Washington County. The first trial resulted in a judgment on a directed verdict for the defendant, which was reversed on appeal. *State, use of Hoffman, v. Potomac Edison Co.,* 166 Md. 138, 170 A. 568. The second resulted in a verdict for the plaintiffs, and this appeal is from the judgment on that verdict.

The case is this: Samuel Merle Hoffman, herein called Merle, a young man nineteen years of age, was electrocuted on September 19th, 1932, by coming too close to a heavily charged guy wire stretched across a public highway near Big Pool Station on the Western Maryland Railroad in Washington County, Maryland. He was employed at the time by his uncle Joseph M. Hoffman, referred to herein as Joseph Hoffman, who was engaged in

the well drilling business. In connection with that work Joseph Hoffman used a well drilling machine mounted on a truck. At about 8.30 o'clock on the morning of the day of the accident, he was driving the truck in an easterly direction over a road known as the Cannery Road, which intersected a public highway known as the State Road, at a point where that road turned south and was carried by a bridge over the tracks of the Western Maryland Railroad, which paralleled the Cannery Road. Near the southwest corner of that intersection, and north of the railroad, was a pole carrying a cross-arm, on which were strung three high-tension transmission wires of the Potomac Edison Company, which ran from it to another pole on the south side of the railroad tracks. A guy wire attached to the pole north of the railroad was stretched diagonally across the intersection and fastened to a tree in a field north of the Cannery Road. As Joseph Hoffman reached the intersection, the superstructure of the well-digging machine, mounted on the truck which he was driving, became entangled with the guy wire, and the energy of the moving machine exerted against the guy wire broke the pole to which the guy wire was attached, so that it fell across the truck and broke one or more of the transmission wires. When that occurred, Merle Hoffman, who was following the truck in a smaller car, stopped, got out, and was said to have climbed on the truck and disengaged the guy wire. After that, and after he had alighted from the truck, in attempting to pass around on the north side of it, he came in contact with or so near to the sagging guy wire that he received the shock which killed him.

At the close of the whole case the plaintiffs offered a damage prayer and an apportionment prayer, which were granted, and the defendant eleven prayers, of which the C, D, fourth, sixth and ninth were refused and the other granted. The C and D prayers were demurrer prayers, and the fourth, sixth, and ninth jury prayers. The rulings on these prayers are the subject of the only exception submitted.

The case was admirably tried both below and in this court. All immaterial and frivolous questions were waived or passed, so that as the case stands the only questions left for consideration are: (1) Whether upon the whole evidence before the court and jury in this case the court should have instructed the jury that Samuel Merle Hoffman was guilty of contributory negligence as a matter of law; and (2) whether the court should have granted (a) defendant's fourth prayer, which would have instructed the jury that if, under the facts and circumstances apparent to Hoffman at the time of the accident, he should as a reasonably prudent and cautious person have thought that the guy wire "might possibly be" dangerously charged with electricity, and thereafter touched it, he was guilty of contributory negligence as a matter of law, and (b) its sixth prayer, by which the jury were to be told that if Merle touched the wire after having been warned by his uncle not to do so he was negligent as a matter of law.

The plaintiff's evidence offered at the second trial differed in no material particular from that offered at the first, which is summarized in *State v. Potomac Edison Co., supra.* At the first trial the case was taken from the jury at the close of the plaintiffs' case, while at this one defendant called witnesses. The appeal from the judgment in the first trial presented two questions: (1) Whether the evidence was legally sufficient to support an inference of primary negligence; and (2) whether it permitted any rational inference other than that the injury and death of Merle Hoffman were in part, at least, caused by his own negligence. It was held in that case that the evidence was legally sufficient to permit an inference of primary negligence, and since the evidence affecting that issue was substantially the same at both trials, it is conceded that that question has been finally adjudicated.

At the first trial the defendant offered no evidence, but unless the evidence which it offered at the second trial so complements that offered by the plaintiffs at both trials that the whole testimony permits no rational inference

other than that the negligence of Merle Hoffman contributed to the accident which caused his death, that question was also closed by the decision in *State v. Potomac Edison Co., supra.* It is not enough that the defendant's evidence tended to contradict that offered by the plaintiffs, which was held in *State v. Potomac Edison Co., supra,* sufficient to permit a rational inference that the defendant's negligence was the sole and exclusive cause of the accident, but it must have introduced some new fact or element missing at the former trial, which taken together with the plaintiffs' evidence excluded any rational inference other than that the negligence of Merle Hoffman contributed to the accident which caused his death. Otherwise defendant's contention on this appeal in respect to its contributory negligence prayer would be merely a reargument of its contention in respect to a similar prayer which was considered on the former appeal.

That view of the question under consideration is not disputed by the appellant, but it contends that, by its evidence offered at the second trial, it proved without contradiction new facts which completely changed the basis of the decision in the former appeal.

The use of electric energy in the industries, and the arts, in communication and transportation, for lighting and for motive power, in the home, the shop, the factory, and the foundry, in the city and in the country, is so universal that at least an empirical and superficial knowledge of its dangerous qualities and characteristics must be assumed to be common to all persons of normal intelligence and experience. So that, where such a person voluntarily comes in contact with, or approaches nearer than a reasonably prudent person would, a wire or other thing which he knows, or, as a person of ordinary knowledge and experience, has reason to believe, is sufficiently charged with electricity to be dangerous, and in consequence of such contact or proximity is shocked and injured, it will be assumed as a matter of law that his own negligence contributed to the accident. *State v. Potomac Edison Co., supra,* and cases there cited.

There is no evidence in the record in this appeal, as there was no evidence in the record in the former appeal, to show that Merle Hoffman had actual knowledge of the fact that the guy wire was charged with electric current at the time he was injured, so that the controlling question on this appeal, as on that, is whether upon the whole evidence he was chargeable with constructive knowledge of the deadly character of the guy wire at the time of the accident. In dealing with that question it may be said that this is not one of those cases where contributory negligence is conclusively shown by the same facts which establish primary negligence, but that here contributory negligence was set up as an affirmative defense, and that the burden was upon the defendant to prove it. *Consolidated Gas Co. v. Rudiger,* 151 Md. 238, 134 A. 326; *Hopper, McGaw & Co. v. Kelly,* 145 Md. 170, 125 A. 779; *Fletcher v. Dixon,* 113 Md. 108, 77 A. 326.

The facts upon which the decision in *State v. Potomac Edison Co., supra,* that Merle Hoffman was not guilty of contributory negligence as a matter of law was based, were: (1) That he had no special knowledge of the properties of electricity nor indeed any knowledge of the qualities and character of electric current not common to persons of ordinary experience; (2) that there was no proof of any visible connection between the transmission wires and the guy wire or the truck; (3) that he had handled the guy wire a short time before the injury without suffering any harm; (4) that while he had been warned that the truck was charged, he was not warned that the guy wire was charged. The contention of appellant is that in this case it conclusively appears from its evidence (1) that there was an open, visible, and plainly apparent contact between the transmission wires and the guy wire, (2) that because of that fact it is immaterial that Merle Hoffman had previously handled the guy wire without injury, but (3) he was in fact warned that it was charged, and (4) that after he had handled it without injury the position of the guy wire may have been changed.

The testimony of the witnesses for the plaintiffs as to any contact between the guy wire and the transmission wires was negative. They were either not asked whether there was any such contact, or, if asked, said that they did not know. The evidence submitted on that point by the defendant showed that there was such a contact, that the two wires were tangled together, and that their connection was visible "from the ground" to any one standing on the railroad side of the truck, "if you looked up you could see it"; but it was not clearly shown that the wires were in the same relation at the time Merle Hoffman was injured, as they were when the witnesses who gave that testimony saw them, and in other particulars their testimony was contradicted not only by the plaintiffs' witnesses but by other witnesses for the defendant.

Joseph Hoffman testified that all of the three wires attached to the cross-arm on the pole to which the guy wire was attached were broken; that: "All three wires were severed otherwise the pole could not have fell. I am positive about that. There was more than one wire down in the cut, all tangled up down in the cut. When I looked later around the scene of the accident certain ends of wires were sparking in the grass. These broken wires were attached to the pole next to the truck, the pole that broke. It was still carrying wires with broken ends and these broken ends reached down into the railroad cut and were sparking there. All three lines were down in the cut, I am positive of that." He also testified that Merle jerked the guy wire, which had been caught in a bolt head (called in the record in the former case a "bull head"), "loose," so that it sagged down between the truck and the tree. "It was loose; he took hold and jerked it right off."

When the truck fouled the guy wire, Joseph Hoffman jumped from the truck, and when he came in contact with the ground, he received a shock, although he was clear of the truck. He then ran down the road towards the station to notify the power company to cut off the current. He left Merle in charge, told him that he (Joseph) had

received a shock, and warned him not to touch anything, and not to let anybody else touch anything.

As Joseph was on his way to the station, he met William K. Kline, driving a horse and wagon, approaching the truck from the east apparently with the intention of driving between it and the tree, and told him not to go near it; that every thing was "hot." Kline nevertheless continued to approach, and to quote his testimony: "I don't know where I was going to stop, I had no idea, may be right up close to the truck. I may have expected to go on by. The wire hung down there but I suppose you could have gone through between the truck and it, I don't know. I don't believe the guy wire was high enough without being lifted for me in my wagon to pass under it. May be I wouldn't have went by. I had already been warned by Joe Hoffman that things were hot. I wasn't just coming as close as I could to see what was there, I wasn't just doing that, I just kept on going. I suppose I would have stopped before I hit the wire. I hadn't no idea what it was doing; just driving on up there." Kline was still approaching the truck when Merle started around it towards him, and in passing the truck came near enough to the wire to receive the shock which killed him.

Roy Snyder, a schoolboy, saw Merle pull the guy wire so that it "swung down." He also said that, while he did not know how many wires there were, they were all broken, and the broken ends attached to the guy wire pole hung down between the fence and railroad track; that those ends were smoking and burned the grass. The testimony of Leon Turner, another schoolboy, tended to corroborate that of Roy Snyder. R. A. Purnell, superintendent of tracks of the Western Maryland Railroad Company, arrived about twenty-five minutes after the accident, and at that time men from the signal maintenance department of the railroad company were engaged in removing wires from the south side of the railroad tracks. At that time, at least two of the wires attached to the broken pole were "swinging down over the cut", making an arc with some honeysuckle vines that were growing near the edge of the bank.

These witnesses were all called by the plaintiffs. On behalf of the defendant, Harry T. Fahrney, line foreman of the Potomac Edison Company, said that only one of the three wires was broken, and that: "The broken wire was in contact with the guy wire on the far side of the insulation approximately fifteen or twenty inches out from this insulation. In a general way the relation of the two wires when I saw them was they were in an entanglement, all together. The entanglement of the two wires on the far side of the insulation was visible from the ground; I saw it from the ground." He also said that he did not know whether there had been any change in the wire conditions before he arrived, but Joseph Hoffman had previously testified that so far as he knew no change had been made. Fahrney further testified that when he arrived the guy wire was tightly wedged under a board on the truck, and that "it would have been quite a difficulty for one to have jerked it out there by himself because it was tied, wedged under the board." He also said: "I stated that this wire was caught in about that position, somewhat back of the cab, and that it was held there tightly under the board. I can't say whether any other raises in the surface on top than the one where the wire was caught. The fact that the truck was standing there on rubber tires would afford an explanation of the failure of Merle Hoffman to get a shock if he was on that truck and touched this wire." He was corroborated by George Werdabaugh and Floyd H. Spiker, employees of the appellant. Werdabaugh said, in part: "I heard people representing the Western Maryland say they had changed this position. One wire was broken; that was the wire farthest away from the truck out towards the railroad. The other two unbroken wires were right against the top of the pole; the pins had been broken and laying against the top of the pole; the two pins nearest the road broke and released the wires and the wires pulled back against the top of the pole."

George H. Hornbaker, an employee of the Western Maryland Railroad Company, said, in part: "I saw the

short end of the broken wire at the broken pole. * * * I could see the tangled wires, see the pole lying over the truck and the wires, the broken power wires that were still attached to the pole and the guy wire in a sort of a tangled mass on top of this derrick. They were all jumbled together, the end of the broken power wire was between the top of the well digging rig and the pole, suspended, hanging over. The broken distribution wire was in contact with the guy wire; they were all tangled. I could see that condition from the ground. There was an insulator on that guy wire that was between the tree side of this derrick and the railroad side of the derrick, and these wires were all tangled up in there. I could see they were all in contact. As I saw it, the broken distribution line was probably in contact with the guy wire in the neighborhood of a foot beyond the insulator hanging out over the edge of the tree side of that derrick." The testimony of other witnesses in one particular or another tended to corroborate this testimony.

Considering the effect of that evidence, it appears, first, that the testimony of the plaintiffs' witnesses did not definitely exclude the possibility that at the time Merle was on the truck the guy wire and the transmission wires were in contact, but that it did permit a rational inference that there was no such contact, or that if there was, that Merle in the exercise of ordinary care may not have seen it. First there was the testimony that all of the transmission wires were hanging over the railroad cut, and that the only visible evidence of danger was supplied by the arcs between the broken ends of those wires and the ground in the railroad cut. The plaintiffs' evidence concerning any visible contact between the guy wire and the transmission wires at the time Merle freed the guy wire was negative. Leon Turner, a schoolboy who was an eyewitness said: "I did not see any other wires on the truck besides the guy wire." Joseph Hoffman said: "I did not see any other wires, other than the guy wire in contact or touching the truck." Roy Snyder said: "After the pole went over against the truck I saw the wires down

in the railroad cut; one was burning in the grass on the right hand side of the truck. It was down in the railroad cut alongside the bank and halfway down the bank, from the top of the bank down to the railroad track. * * * The wires were hanging down between this fence and the railroad track. They were the wires that I saw smoking; they were the wires that burned the grass. The wires that I saw down there in the grass were broken. I do not know how many wires I saw there. I saw no wires down there that were not broken; they were all broken." That such a contact must have been made directly or indirectly before Merle was shocked is obvious, but it may have been inferred from the positive testimony that the broken ends of the transmission wires were hanging down the railroad cut and in contact with the ground there; that as long as they were in that position they were not in contact with the truck or the guy wire.

It is probable that, at the time Merle freed the guy wire, either it or the truck was charged, and the simple and rational explanation of his failure to receive a shock at that time, while he did receive one when he touched the guy wire shortly afterwards, is that the truck was insulated from the ground by its rubber tires, and as long as he was on it he furnished no connection between the transmission wires and the ground, but when he stood on the ground and touched the charged wire his body made such a connection. But obvious as that conclusion is, it was not suggested by any witness for the defendant except as a possibility by Fahrney, although the daily occupation of several of those witnesses involved the handling, maintenance, and care of electric lines and wires.

There was also evidence tending to prove that at the time he received the shock Merle was hastening towards Kline, who was apparently driving into the wire. One witness said that he attempted to raise the wire; others, including Kline, could not say that he actually touched it. But it is undisputed that as he raised his hand he received the shock which killed him. It may reasonably be inferred that he intended to stop Kline from coming nearer

to the truck, and, while the fact, if it was a fact, that he was injured in an effort to save another from peril, would not under the circumstances in itself have been sufficient to excuse him from negligence in coming so near the wire, if he knew or should have known of its deadly character, nevertheless it was a fact to be considered in connection with the other facts and circumstances in characterizing the quality of his act in respect to negligence.

It was held in *State v. Potomac Edison Co., supra,* that under those facts and circumstances, the negligence of Merle Hoffman was a jury question, and it must be so held on this appeal, unless the defendant's evidence is to be accepted as conclusively establishing the fact that the transmission wires were in such visible contact that one in the situation of Merle must, had he exercised reasonable and ordinary care, have discovered it.

To hold one of his age and experience negligent in law because he failed to realize that, although he had handled a charged wire with safety while on the truck, it might nevertheless be fatal to touch or come near to the same wire if he was standing on the ground, would be unreasonable, especially in view of what so experienced a lineman as Fahrney said: "I don't know why this young man didn't get a shock when he got up on the truck and handled this guy wire with his bare hands. There were supposed to be 6900 volts in the wire. With the current in the wire at that time and he got the benefit, it would have killed him then just as much as it did afterwards. I couldn't say whether or not the current was off at the particular time he attempted to move the guy wire. I can't tell why he was not killed at that time.' *O'Donnell v. North Attleborough,* 222 Mass. 591, 111 N E. 374; 84 *A. L. R.* 694; 45 *C. J.* 949; 20 *R. C. L.* 110.

Valuation of defendant's evidence in respect to the visibility of the contact between the guy wire and a transmission wire involves these factors: (1) Whether the burden was upon the defendant to establish that fact; (2) whether the evidence tending to establish it was in conflict with that of the plaintiffs; and (3) whether it

permits any rational inference other than that there was such a contact and that Merle Hoffman either did or in the exercise of reasonable care should have known of it.

The term "burden of proof," sometimes distinguished from the "burden of evidence" (*State v. Cox*, 325 Mo. 901, 30 S. W. (2nd) 462, 465,) means finally the obligation to go forward, or that he who asserts a fact either by way of complaint or defense assumes the burden of proving it. Where a plaintiff has made out such a case of negligence as warrants a recovery in an action of tort, and the defendant relies upon contributory negligence arising from facts not shown in the plaintiff's evidence as a defense, the burden of proof is upon him to establish those facts. *State v. Cox, supra;* 45 *C. J.* 1171 (6th Ed.) ; *Shearman and Redfield on Negligence,* secs. 108, 109; *Caroline County v. Beulah,* 153 Md. 221, 138 A. 25; *Taxicab Co. v. Ottenritter,* 151 Md. 525, 135 A. 587; *Consolidated Gas etc. Co. v. Rudiger,* 151 Md. 226, 134 A. 326; *Jackson v. Hines,* 137 Md. 621, 113 A. 129; *Fletcher v. Dixon,* 113 Md. 101, 77 A. 326; *Anne Arundel County v. Carr,* 111 Md. 141, 73 A. 668; *Phila. B. & W. R. Co. v. Hand,* 101 Md. 233, 61 A. 285; *Balto. & O. R. Co. v. Stumpf,* 97 Md. 78, 54 A. 978; *Baltimore Traction Co. v. Helms,* 84 Md. 515, 36 A. 119; *Central R. Co. v. Smith,* 74 Md. 212, 21 A. 706; *State v. Union R. Co.,* 70 Md. 69, 18 A. 1032; *Phila.W. & B. R. Co. v. Hogeland,* 66 Md. 149, 7 A. 105; *Prince George's County v. Burgess,* 61 Md. 29; *Balto. & O. R. Co. v. State,* 60 Md. 449; *State v. Balto. & Pot. R. Co.,* 58 Md. 482; *Frech v. Phila. W. & B. R. Co.,* 39 Md. 574. In determining whether that burden has been met, consideration must be given to "the important presumption that he exercised ordinary care for his own safety. *Lozzi v. Pennsylvania R. Co.,* 152 Md. 508, 137 A. 293; *Hopper, McGaw & Co. v. Kelly,* 145 Md. 170, 125 A. 779; *Burke v. Baltimore,* 127 Md. 561, 96 A. 693; *Balto. & O. R.. Co. v. Stumpf,* 97 Md. 91, 54 A. 978." *State, use of Pachmayr, v. Balto. & O. R. Co.,* 157 Md. 262, 145 A. 611, 614. In view of the facts that under the law of this State the burden was upon the plaintiff

to prove as a part of his case that he was himself free from negligence (*Evans v. Balto., C. & A. Ry. Co.*, 133 Md. 34, 104 A. 112), that the evidence offered by the plaintiff was *prima facie* sufficient to permit a recovery (*State v. Potomac Edison Co., supra*), and that the particular facts under consideration, and which were relied upon by the defendant to show contributory negligence, did not appear in the plaintiffs' evidence, the burden was upon it to furnish satisfactory proof of them.

Those facts were that a transmission wire was entangled with the guy wire, that the two wires were "coiled up" under the cross-arm and across the pole and across the derrick mounted on the truck, and that that condition was visible from the ground at the time the witnesses who gave that testimony arrived on the scene.

Of those witnesses, Fahrney said the "loose end" of the transmission wire was "coiled on top of the truck in contact with the guy wire"; Werdabaugh said, "I saw one end which was on the top of the truck" in contact with the guy wire; Spiker said, "this broken fragment was doubled up with the guy wire underneath the pole"; Hornbaker said, "the end of the broken power wire was between the top of the well digging rig and the pole," and in contact with the guy wire; Chapman said, "I could see the broken end of the wire, it was under the pole and on top of the derrick." Four of those witnesses said that one wire was broken; the other, Chapman, did not refer to the number of wires that were broken, nor did he see any contact between the guy wire and a transmission wire.

When that evidence is compared with that offered by the plaintiffs, that there were but three transmission wires, that all three were broken, and that the ends of the broken wires were hanging down in the railroad cut, only two inferences are possible, either that the conditions were different at the time defendant's witnesses saw them from what they were at the time of the accident, or that one or the other of the two descriptions was inaccurate. For if all three wires were broken, and

all the ends of the broken wires were in the railroad cut, they could not at the same time be on top of the truck, which was on the county road. But in neither event can it be said that the facts alleged by the defendant as a basis for the conclusion that Merle Hoffman was guilty of contributory negligence as a matter of law were undisputed. It also follows that the whole evidence was sufficient to permit a rational inference that Merle Hoffman, at the time of the accident, neither knew, nor as a matter of law was bound in the exercise of ordinary care to know, that the guy wire was in contact with the transmission wire.

There was therefore no error in the refusal of the defendant's C and D prayers, nor for the reasons assigned in *State v. Potomac Edison Co., supra,* was there error in the refusal of its sixth prayer.

The defendant's fourth prayer announced the proposition that if the jury found that the facts and circumstances apparent to Merle Hoffman at the time of the accident "were such as to cause a reasonably cautious and prudent person to think that the guy wire attached to said pole might possibly be dangerously charged with electricity, and if the jury further found that the said Samuel Merle Hoffman thereafter either touched said guy wire or came in such close proximity thereto as to receive a charge of electricity therefrom as a result of which the said Samuel Merle Hoffman was electrocuted, then the jury are instructed that said Samuel Merle Hoffman was guilty of negligence directly contributing to his death and the verdict of the jury must therefore be for the defendant." It is suggested that that prayer was properly refused because knowledge of the mere possibility of danger was not sufficient to convict the father and husband of the equitable plaintiffs of negligence, but that if it was, the refusal of the prayer was not injurious, because other granted prayers fully and accurately stated the law of the case.

Reduced to its simplest terms, the proposition expressed in the prayer is whether the conduct of one who

voluntarily does an act, which as a reasonably cautious and prudent person he has reason to believe may possibly result in his death or serious bodily harm, can properly be characterized as negligence.

"Possible" is often used to describe a contingency which may but is not likely to occur; it is also used at times to intensify the meaning of such words as "might" or "could," and it has been construed to be equivalent to "practicable," or "reasonably practicable." *Words and Phrases*, First, Second, Third, and Fourth Series. It is defined by the lexicographers as that which can or may be done. As used in the prayer under consideration, it adds little, if anything, to the meaning of "might," which it qualifies, and the obvious meaning of the prayer is that, if Hoffman knew or should have known that the wire might be so heavily charged with electric current as to be dangerous and nevertheless touched it, he was negligent.

There seems to be no sound reason why that should not be so. If he chose to assume the risk of experimenting with an instrumentality which he knew might be highly dangerous or even deadly, even though he may have thought that the possibility of danger was remote and unlikely, it would seem nevertheless that he could not well escape the charge of negligence. It was not as though he was unaware of the extent of the danger if it happened that the wire was charged, but that, knowing the nature of that danger, he exposed himself to the risk of discovering whether the wire was in fact charged.

Certainly if one cocks a firearm which he believes may possibly be loaded, points it at another, and pulls the trigger, he is none the less guilty of negligence because he does not actually know that it is loaded, but does know that if it is loaded death or serious bodily harm will result.

In *Haselmaier v. Milwaukee Electric Ry. & Light Co.*, 185 Wis. 210, 201 N. W. 257, 258, it is said: "It is elementary that one who voluntarily subjects himself to a danger or hazard appreciating the consequences there-

of is held either to have assumed the risk or to be guilty of contributory negligence, as the case may be. And it is not necessary, in order to assume the risk or be guilty of contributory negligence, that he should fully appreciate the precise nature of the danger or anticipate the precise result that actually follows. It is sufficient if he knows in a general way that he will be likely to be seriously injured if he does the act in question." And it would seem that the same consequences should flow from an act which he knew might possibly result in his own death or injury from an act which he knew would likely so result.

A more serious objection to the prayer is that it involves the proposition that Hoffman was guilty of negligence in law if he came "into such close proximity to" a wire, which he knew or should have known to be charged with electricity, as "to receive a charge of electricity." The evidence is consistent with the hypothesis that Hoffman, at the time he received the fatal shock, did not come into actual contact with the guy wire, but that he came so near to it that the current jumped across the intervening space and shocked him. There was no evidence that he knew the voltage of the current flowing along the wires, nor that he knew that mere proximity without contact with the wire would be dangerous. It may well be presumed that persons familiar with the laws and properties of electric current know that the tension of the electric current flowing over a wire may become so high that under favorable circumstances it will arc or jump over an intervening space, varying in extent with the tension, to effect a ground. But assuming, without deciding, that such knowledge is so commonplace that it may be attributed as a matter of law to one of ordinary experience, nevertheless it cannot be assumed as a matter of law that such a person will also know the extent of the danger zone. The vice of the prayer is that it makes negligence depend upon the effect of the condition creating the danger rather than upon actual or constructive knowledge of the danger. Without

necessarily going as far as *Appalachian Power Co. v. Hale*, 133 Va. 416, 113 S. E. 711, 714, where the court, referring to same question, said of the plaintiff's intestate, "He certainly did not know that the electricity would jump to him without his touching the wire," it may at least be said that, in the absence of proof of actual knowledge, whether Merle Hoffman's proximity to the wire constituted negligence depended upon whether he should, as a person of ordinary knowledge and experience, have known the extent of the danger zone about the wire, and that, under the circumstances, was a question of fact and not of law. Since the prayer definitely rejected that theory, it was properly refused.

It follows from what has been said that the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*