George **MANAIA**, Jose Santos Gago, James R. Bice, Administrator of the Estate of Jose Lourenco, Deceased, State of Maryland to the use of Maria Da Conceicao Barreto, et al., Appellants,

v.

**POTOMAC ELECTRIC POWER COMPANY, Appellee.**

**No. 7786.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 23, 1959.

Decided June 18, 1959.

Sheldon E. Bernstein, Washington, D. C., and Herbert M. Brune, Baltimore, Md. (R. Edwin Brown, Harper M. Smith, Rockville, Md., and Newmyer & Bress, Washington, D. C., on brief), for appellants.

William B. Jones, Washington, D. C. (Robert R. Bair, Baltimore, Md., Cornelius Means, Hamilton & Hamilton, Washington, D. C., and Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Circuit Judge, and PAUL and BOREMAN, District Judges.

HAYNSWORTH, Circuit Judge.

Two employees of a paving contractor were killed and five others injured when the boom of a crane with which they were working was brought so close to high voltage wires that the current arced to the crane's cable and was conducted to the ground through the bodies of the unfortunate men who were touching the crane's metal load. Apparently because the deaths and injuries were compensable under Maryland's workmen's compensation act, M.G.L.A. c. 152, § 1 et seq., these actions for wrongful death and personal injury were brought, not against the paving contractor whose negligence seems plain, but against the owner of the electric wires.

The District Court reserved its ruling upon motions for directed verdict, and, after verdicts for the plaintiffs, entered judgment for the defendant *non obstante veredicto*. In its full and careful opinion,[1] there is a very complete statement of the facts, which need only summary treatment here.

Potomac Electric Power Company (Pepco) owned a substation on the southwest corner of Old Bladensburg Road and Fern Street in Wheaton, Maryland,

1. 163 F.Supp. 671.

but set some distance back from the property line on each street. Among the circuits running into and from the substation is a 33,000-volt feeder, running west near the southern side of Old Bladensburg Road. This power line crosses Fern Street approximately 35 feet south of the southern side of Old Bladensburg Road, and corners on a pole slightly more than two feet from the western curb of Fern Street, each of its three wires being supported by three large, bell-shaped, suspension insulators in series. From that pole the three wires run southwesterly to terminals on the substation. No other overhead power lines cross Fern Street, though there is a line running south from the substation along the west side of Fern Street.

In 1955, Montgomery County decided to improve Fern Street. It was then an unimproved dirt road one and one-half to two blocks long, with only two or three buildings facing it.[2] Plans were sent to Pepco showing the proposed improvement. These plans called for a macadam surface for the northern part of Fern Street to a point at least twenty feet south of Pepco's power line crossing. South of that point, the plan provided for concrete surfacing. Pepco, accordingly, arranged to relocate several of its poles along Fern Street to clear the proposed work, and these relocations were accomplished. They included a relocation of the pole nearest Old Bladensburg Road, the one with the three series of heavy suspension insulators carrying the 33,000-volt feeder crossing Fern Street, this pole being moved a few inches to the west away from the western curb line of Fern Street. Otherwise, the crossing of this power line over Fern Street remained unchanged. A second set of plans was sent to Pepco, be-

fore the work was accomplished, identical with the first, as far as we are concerned, except that they bore a notation, for the paving contractor, requiring the use of concrete finishing machines on the concrete slabs, upon the basis of which the District Court assumed that Pepco had constructive notice that a mobile crane might, or probably would, be used to place the finishing machine upon its rails.

In July 1955, Montgomery County awarded a contract for the improvement of Fern Street to Sligo Engineering Company. Early in August, Sligo did the necessary grading, during which time Pepco was engaged in the relocation of its poles and facilities.[3] After an interval of approximately thirty days, a mobile crane owned by Sligo brought in a concrete finishing machine, deposited it on the east side of Fern Street, and withdrew to work on other projects. On September 2, 1955, Sligo set rails to confine and measure the first concrete strip, upon which the finishing machine would run. At approximately 10:30 o'clock that morning, Sligo's mobile crane arrived on the scene and positioned itself beneath the overhead crossing of Pepco's power line. The body of the crane was north of the crossing, the crane operator estimating that the power lines were some five to ten feet south of his cab at the rear of the truck, and plainly in his view as he worked his 40-foot boom rearward and southward. Working, thus, immediately beneath the power line, the crane picked up the concrete finishing machine on the east side of Fern Street, south of the power line, and moved it into position over the rails north of the northernmost extremity of the proposed concrete strips, but still south of the power line. This required the crane operator to bring his boom close to the power line which was

---

**2.** One of those buildings housed the offices of Sligo Engineering Company, the owner of the crane involved in these actions and the employer of the plaintiffs.

**3.** Sligo's contract required it to notify utilities to make necessary adjustments to their equipment. Neither Sligo nor Montgomery County nor anyone else

suggested that Pepco should remove, alter or suspend the overhead crossing of its power line, except for the slight relocation of the one pole, which was accomplished. What was done was entirely satisfactory, apparently both to Sligo and Montgomery County, and there was no suggestion that Pepco then should have done more than it did.

above and in front of him, the wires of which he was watching. His crewmen wished the machine positioned a few inches farther north, and, in response to their command, the operator, watching the wires of the power line all the while, raised his boom still closer to them.[4] Within seconds, two of his crewmen were electrocuted and the others, in contact with the finishing machine, were injured.

The crane operator had previous experience with crane booms fouling electric lines. He knew that electricity would arc to his metal boom, particularly on damp days, as that one was, when the boom and the ground were wet. Had he known the lines carried 33,000 volts, he would not have placed his boom within fifteen feet of them, he testified. He "assumed" the lines carried 1500 volts, but he stated no ground for his assumption, and he did not see the pole which supported the wires, the heavy insulators in series which carried them or the substation to which they ran, for he did not look. At the risk of his crewmen, he tested his baseless assumption without an inquiring glance to left or right.

The foreman, who directed the initial placement of the crane, did not testify.

Some of the surviving crewmen, who are plaintiffs, testified that they saw no power line for they did not look up, while others testified that they saw the wires but assumed they carried domestic current of 110 volts.[5] If it may be supposed that the construction crewmen were ignorant of the fact that such domestic current must be taken down from moderately higher voltages by transformers not far distant from the loads, credulity is strained by the testimony of the chief executive officer of Sligo Engineering Company, whose offices were just to the rear of the substation, that he thought the three overhead wires on the heavy insulators were domestic current for the use of unapparent consumers. How far credulity may be strained here is of no importance, however, for the assumptions, without inquiry, of Sligo's executives and employees are immaterial to our present question. Pepco had a right to assume that a construction company and its construction crew would not intentionally foul its power line without a glance at the immediately adjacent pole and the insulators which carried the wires, the substation into which they led, or the area, without apparent domestic demand from this line, along its route, all of which shouted the fact of high voltage.

The plaintiffs went to pains to elicit testimony, upon which they strongly rely, that one looking at the wires, alone, could not tell what voltage they carried. Of course, one could not. Perhaps one moderately observant could tell from the wires themselves that they were not domestic service lines, as the crane operator seems to have realized, but, if the field of view is widened to include the obvious insulators which carried the wires and still further extended to include the substation and the course of the power line, all of which was in plain view, one with any knowledge of electricity and its distribution would know this was a high voltage line. Whether it actually carried 13,200, 33,000, 44,000 or some other voltage, an expert, perhaps, could not accurately tell immediately, but a reasonably informed amateur could tell that they carried a dangerous current and, if it was material to know, by

---

4. The lowest of the power line wires was some thirty feet above the roadway. Some feet below that was a header which would obstruct the passage of high equipment attempting to move along Fern Street. The heavy suspension insulators carried the power lines at the crane's location possibly a foot or more south of the header, which was centered on the two poles, and the high-angle at which the boom was raised permitted it to come in close proximity to the lower of the power line wires without being obstructed by the header.

5. The testimony discloses nothing in the area which could have been mistaken for a domestic or commercial service line coming from this power line.

a telephone call to Pepco, he could ascertain precisely what the voltage was.

It is thus apparent that this is not a case in which the plaintiffs were entrapped into contact with high voltage lines concealed from ordinary view, confusingly strung or deceptively re-energized.[6] No fault is suggested in the line, its construction, maintenance or operation. Though the line, itself, should have given to one who looked warning to stand clear, plaintiffs contend that Pepco should have done something more to bring home to Sligo and its construction crew that the lines carried 33,000 volts. Had the construction crew consciously realized what the voltage was, it is said, it would have exercised greater care than it did to avoid the line's proximity.

Electricity is a dangerous thing and can work harm of such gravity upon one who comes into unintended contact with it, that power companies, rightly, have been required to exercise a very high degree of care to safeguard those whose lawful pursuit exposes them to the risk of inadvertent contact with the power lines. Conowingo Power Co. v. State of Maryland, 4 Cir., 120 F.2d 870; Smith v. Appalachian Electric Power Co., 4 Cir., 74 F.2d 647; Banks v. Central Hudson Gas & Electric Corp., 2 Cir., 224 F.2d 631; American General Ins. Co. v. Southwestern Gas & Electric Co., 5 Cir., 115 F.2d 706; Futrell v. Arkansas-Missouri Power Corp., 8 Cir., 104 F.2d 752; Isbell v. Union Light, Heat & Power Company, D.C.E.D.Ky., 162 F.Supp. 471; Teddleton v. Florida Power & Light Co., 145 Fla. 671, 200 So. 546; Hagerstown & F. Ry. v. State, 139 Md. 507, 115 A. 783, 19 A.L.R. 797; Walter v. Baltimore

Electric Co., 109 Md. 513, 71 A. 953, 22 L.R.A.,N.S., 1178; Brown v. Edison Electric Illuminating Co., 90 Md. 400, 45 A. 182, 46 L.R.A. 745; Pike v. Consolidated Edison Co. of New York, 303 N.Y. 1, 99 N.E.2d 885. They are not insurers, however, and their duty is not absolute. As the Court of Appeals of Maryland, whose decisions govern us in this diversity case, has said:[7]

"In accordance with these basic principles, the law does not require that a person, who maintains even so deadly an instrumentality as a high voltage electric wire, shall anticipate at his peril every possible fortuitous circumstance under which some person might make a contact with the wire, resulting in injury or death. * * *

"The law does not require an electric company to insulate its high-tension wires everywhere, but only where there is reason to apprehend that persons may come in contact with them either in the pursuit of their calling or where they may be reasonably expected to go. * * * *"

If we assume, as the District Court did, that the notation on the second set of plans requiring the paving contractor to use a concrete finishing machine on the concrete strips to be poured south of the overhead power crossing, was constructive notice to Pepco that a crane might, or probably would, be used to place the machine upon its rails, it was not notice that such a crane might be used beneath the power line, or in close proximity to it. The northernmost extent of the concrete strips was at least twenty feet south of the power line,

6. See Conowingo Power Co. v. State of Maryland, 4 Cir., 120 F.2d 870.

7. Le Vonas v. Acme Paper Board Co., 184 Md. 16, 40 A.2d 43, 45. See also, State for use of Bahner v. Consolidated Gas, Electric Light & Power Co., 159 Md. 138, 150 A. 452; Burns v. Carolina Power & Light Co., 4 Cir., 193 F.2d 525; Croxton v. Duke Power Co., 4 Cir., 181 F.2d 306; Banks v. Central Hudson Gas & Electric Corp., 2 Cir., 224 F.2d 631; American General Ins. Co. v. Southwestern Gas & Electric Co., 5 Cir., 115 F.2d 706; Isbell v. Union Light, Heat & Power Company, D.C.E.D.Ky., 162 F.Supp. 471; Lewis v. Pacific Gas & Electric Co., 95 Cal.App.2d 60, 212 P.2d 243; Sweatman v. Los Angeles Gas & Electric Corp., 101 Cal.App. 318, 281 P. 677; Buell v. Utica Gas & Electric Co., 259 N.Y. 443, 182 N.E. 77; Van Leet v. Kilmer, 252 N.Y. 454, 169 N.E. 644.

and Pepco was hardly bound to anticipate at its peril that a crane would be positioned north of its power line crossing to place a concrete finishing machine upon rails at a point south of the crossing. In addition to the many alternatives open to Sligo, suggested in the opinion of the District Court, there is no apparent reason the finishing machine could not have been placed at the precise spot Sligo selected and without risk of fouling the power line by positioning the crane south of that spot, the crane operator facing north, the sheave of his boom being well short of the power line. When Sligo, without disclosing to Pepco its specific purpose, undertook its accomplishment by a course of conduct fraught with seemingly grave and obvious danger, while neglecting the equally practical alternatives which entailed no risk, its operations were beyond the bounds of anything Pepco might reasonably have anticipated. The crane had arrived upon the scene only a few minutes before the tragedy, and it is not contended that Pepco had any actual knowledge, or any opportunity to know, of its presence on Fern Street, much less of its operation beneath the power line. See cases cited in footnote 7.

Pointing to such cases as Banks v. Central Hudson Gas & Electric Corp., 2 Cir., 224 F.2d 631; Conowingo Power Co. v. State of Maryland, 4 Cir., 120 F.2d 870; Smith v. Appalachian Electric Power Co., 4 Cir., 74 F.2d 647; Potomac Edison Co. v. State, Use of Hoffman, 168 Md. 156, 177 A. 163; Casualty Co. of America v. A. L. Swett Electric Light & Power Co., 230 N.Y. 199, 129 N.E. 653; Pike v. Consolidated Edison Co. of New York, 303 N.Y. 1, 99 N.E.2d 885, the plaintiffs seek to draw a distinction between those cases in which the wires involved ran over, or along, public streets and ways and those in which the wires ran above private property, contending that in the former case the utility's duty approaches the absolute. Of course, there is a difference in the anticipated uses of streets and roads and those of undeveloped private lands. The hazards to

be anticipated in construction work in crowded, commercial areas are not the same in kind or quality as those involved in construction, of the usual sort, on private land in rural areas. The differences affect the utility's duty of care, for the place of the work and a great many other circumstances must be considered in discriminating between risks which the utility should have anticipated and those which it need not have. In a given factual situation, however, the extent and nature of the utility's duty is not dependent upon the identity of the grantor of its easement. Here the wires were not in close proximity to work which Pepco might reasonably have anticipated. Sligo's use of Fern Street was one of those "fortuitous circumstances" of which the Maryland Court of Appeals spoke in Le Vonas v. Acme Paper Board Co., 184 Md. 16, 40 A.2d 43, and for which, under the decisions of that court, the power company is not responsible. See also: State for use of Bahner v. Consolidated Gas, Electric Light & Power Co., 159 Md. 138, 150 A. 452; Burns v. Carolina Power & Light Co., 4 Cir., 193 F.2d 525; Croxton v. Duke Power Co., 4 Cir., 181 F.2d 306; Banks v. Central Hudson Gas & Electric Corp., 2 Cir., 224 F.2d 631; American General Ins. Co. v. Southwestern Gas & Electric Co., 5 Cir., 115 F.2d 706; Isbell v. Union Light, Heat & Power Company, D.C.E.D.Ky., 162 F. Supp. 471; Lewis v. Pacific Gas & Electric Co., 95 Cal.App.2d 60, 212 P.2d 243; Sweatman v. Los Angeles Gas & Electric Corp., 101 Cal.App. 318, 281 P. 677; Buell v. Utica Gas & Electric Co., 259 N.Y. 443, 182 N.E. 77; Van Leet v. Kilmer, 252 N.Y. 454, 169 N.E. 644.

We agree with the District Court that there was insufficient evidence of negligence of Pepco to support the verdicts.

Finally, it is said that granting these judgments n. o. v. was a denial of the plaintiffs' rights under the Seventh Amendment. It is apparent from their brief, however, that the learned counsel for the plaintiffs have no deluding im-

pression that this contention adds anything of substance to their position. They seem to recognize that no constitutional question arises when the court withdraws from the jury a case in which there is no issue of fact requiring the jury's determination. The power of the court to withdraw such cases from the jury is too firmly rooted in history and tradition for frontal attack. Nor do the parties here suggest that the power be allowed to atrophy, for its employment within its well defined boundaries is a protective restriction as necessary to the vigorous functioning of the jury system as preservation of the prerogatives of the jury. The contention does not question the established principles; it merely seeks an obscuring injection of the linguistics of constitutional principle into the familiar process of appraisal of evidence and its associated inferences.

Were a court indifferent to the established basis upon which powers have been allocated between the court and jury or beguiled into rejection of every view which seemed to it less reasonable than its own, a violation of constitutional right might well be said to have occurred. The District Court, here, however, was conscious of the limitations of its power, and conscientious and objective in its exercise. Citing Burcham v. J. P. Stevens & Co., 4 Cir., 209 F.2d 35, he approached the problem "in the light of the admonition of the Court of Appeals of this Circuit as to the limited authority of trial judges to disturb jury verdicts," as do we. [163 F.Supp. 672.] Even the plaintiffs describe his approach as "fair-minded." The attempt, therefore, to glamorize the problem by an invocation of the Seventh Amendment is, at best, an irrelevance contributing nothing to the objective disposition of such questions as this. See the opinion of Mr. Justice Frankfurter in Dick v. New York Life Insurance Co., 359 U.S. 437, 79 S. Ct. 921, 3 L.Ed.2d 935; Smith v. Reinauer Oil Transport, Inc., 1 Cir., 256 F.2d 646.

Affirmed.